Gilbert Harold **STORK**, etc., et al.,
Plaintiffs,

v.

**UNITED STATES** of America et al.,
Defendants,

and

Cases Consolidated Therewith by Orders Dated July 6, 1966, Nos. 3596–SD–K through 3622–SD–K, inclusive; Northern District of California Nos. 39836, 39929, 40149, 41070, 41071.

Civ. No. 3595–SD–K.

United States District Court
S. D. California.

July 7, 1967.

Hoberg, Finger, Brown & Abramson, by Michael J. Kennedy, San Francisco, Cal., for plaintiffs Van Horn and Green.

Belli, Ashe, Gerry & Ellison, by Richard F. Gerry, San Francisco, Cal., for all other plaintiffs.

Edwin L. Miller, Jr., U. S. Atty., Southern District of California, San Diego, Cal., and Donald A. Fareed, and Theodore E. Orliss, Special Asst. U. S. Attys., Los Angeles, Cal., for the United States, John R. Harrison, Federal Aviation Administration, Washington, D. C., of counsel.

## MEMORANDUM OF DECISION

KUNZEL, Chief Judge.

These twenty-eight consolidated cases,[1] and five cases from the Northen District

1. 
| Civil No. 3595–SD–K | Gilbert Harold Stork, etc., et al. vs. United States of America, et al. |
|---|---|
| Civil No. 3596–SD–K | Harry J. Morris, etc. vs. United States of America, et al. |
| Civil No. 3597–SD–K | F. Sheldon Harden vs. United States of America, et al. |
| Civil No. 3598–SD–K | Leroy B. Hughes vs. United States of America, et al. |
| Civil No. 3599–SD–K | Howard R. O'Daniels vs. United States of America, et al. |
| Civil No. 3600–SD–K | Walter G. Williamson vs. United States of America, et al. |
| Civil No. 3601–SD–K | General Owens, Jr. vs. United States of America, et al. |
| Civil No. 3602–SD–K | John D. Nettleship vs. United States of America, et al. |
| Civil No. 3603–SD–K | Brent E. Jobe vs. United States of America, et al. |
| Civil No. 3604–SD–K | Roy Scialabba vs. United States of America, et al. |
| Civil No. 3605–SD–K | Robert C. Johnson vs. United States of America, et al. |
| Civil No. 3606–SD–K | Richard D. McBride vs. United States of America, et al. |
| Civil No. 3607–SD–K | Harold R. Lobaugh, etc. vs. United States of America, et al. |
| Civil No. 3608–SD–K | Wayne W. Baughn, etc. vs. United States of America, et al. |
| Civil No. 3609–SD–K | Ralph Stewart, etc. vs. United States of America, et al. |
| Civil No. 3610–SD–K | Ida Mae Green, etc. vs. United States of America, et al. |
| Civil No. 3611–SD–K | C. A. Carlson vs. United States of America, et al. |
| Civil No. 3612–SD–K | Dorothy J. Porras, etc. vs. United States of America, et al. |
| Civil No. 3613–SD–K | Billie W. Ross vs. United States of America, et al. |
| Civil No. 3614–SD–K | Carl G. Bowser vs. United States of America, et al. |
| Civil No. 3615–SD–K | William Dauphin, etc. vs. United States of America, et al. |
| Civil No. 3616–SD–K | Kay Copeland, etc. vs. United States of America, et al. |
| Civil No. 3617–SD–K | Willis Hill, etc. vs. United States of America, et al. |
| Civil No. 3618–SD–K | Marlene Austin, etc. vs. United States of America, et al. |
| Civil No. 3619–SD–K | Lloyd Frederick Van Horn, etc. vs. United States of America, et al. |
| Civil No. 3620–SD–K | Nellie Hennigan, etc. vs. United States of America, et al. |
| Civil No. 3621–SD–K | Russell F. Woods, et al. vs. United States of America, et al. |
| Civil No. 3622–SD–K | Gerald Sorenson, etc. vs. United States of America, et al. |

of California,[2] tried together with the consolidated cases,[3] arise out of the crash of a C–46 airplane at the Toledo Express Airport on October 29, 1960, at approximately 2202 hours. The United States is sued under the provisions of the Federal Tort Claims Act, for the alleged negligence of air traffic controllers (hereinafter designated as controllers) who were employees of the Federal Aviation Agency.

There were forty-five passengers aboard, twenty of whom were fatally injured. The captain and the co-pilot were also fatally injured. The other passengers and the stewardess suffered injuries varying in degrees of severeness.

The airplane had been chartered by California State Polytechnic College from Arctic Pacific, Inc. (now defunct), a non-scheduled air carrier licensed by the FAA under 14 C.F.R. Part 42, for the purpose of transporting its football team from Santa Maria, California, to Toledo, Ohio, and return. The crash occurred at take off on the return leg of the journey.

The principal reason that these cases against the United States have been so long delayed is that the insurance carrier for Arctic Pacific, Inc. brought a declaratory relief action seeking to have its contract of insurance declared void for reason of certain breaches of warranty by Arctic Pacific. All plaintiffs in the instant actions were made parties.

A settlement of this declaratory relief action was finally reached whereby the insurance carrier paid to plaintiffs herein approximately fifty per cent of its contractual liability of $25,000.00 per seat.

The United States filed third-party complaints against Arctic Pacific (its insurance carrier) seeking indemnity. These complaints were dismissed by the court on the ground that under the law of Ohio the releases given by plaintiffs to the insurance carrier for Arctic Pacific, would release the United States if the United States was held to be only passively or secondarily negligent; and, if the United States was held to be actively negligent, no right of indemnity would exist.

The United States contended that the releases given by plaintiffs to Arctic Pacific also released the United States inasmuch as the law of Ohio provides that, unless there is an express reservation, the release of one joint tort feasor releases all others. However, leave was granted to reform the releases so as to provide that the United States was specifically excepted from the provisions of the releases.

The cases have been tried on the question of liability only.

Practically all of the essential facts were stipulated to, and, briefly, they are:

Between 2030 and 2100 hours the pilot visited the weather bureau at the field and was informed that visibility was $\frac{1}{16}$th of a mile in fog, and that $\frac{7}{10}$ths of the sky was obscured.

At 2118 the pilot filed an Instrument Flight Rules (IFR) Plan.

At 2133 hours the visibility dropped to zero and fog, which continued until

2. Northern District of California cases:
Civil No. 39836 Alfred T. Tollner, Jr., etc. vs. United States of America, et al.
Civil No. 39929 Albert Marinai vs. United States of America, et al.
Civil No. 40149 James L. Fahey vs. United States of America, et al.
Civil No. 41070 Donald R. Adams; Vladimir W. Shimek; Anne Clark, Mother and sole heir of Marshall Kulju, deceased; and Frederick Brown, Jr. vs. United States of America
Civil No. 41071 Eva Ledbetter vs. United States of America

3. Northern District of Illinois Eastern Division
Civil No. 62–C–1281 John C. Bell, Sr. vs. United States

after the accident. This latter condition was not reported to the crew by either the weather bureau or the controller, nor was any such information requested by the crew. However, the accident report indicates that this information was given by the tower to the weather bureau.

The runway visibility transmissometer was inoperative, and the pilot was not advised of this.

At 2138 the engines of the airplane were started without difficulty, and at 2139 the crew called the tower for taxi clearance.

At 2150 the tower cleared the airplane for take off, and at 2155, pursuant to request from crew, a corrected take off clearance was given by the tower, and at 2201 the airplane was cleared for take off.

The airplane was heard to pass the tower and, as it started down the runway, it swerved to the right and then more abruptly to the left. Some of the passengers testified the plane seemed to fishtail as it proceeded down the runway. It made a premature lift off and climbed to an altitude of 50 to 100 feet when it stalled and crashed.

A transcript of a tape recording of statements made by tower personnel to the crew of the plane prior to take off is in evidence. At the time of the incident two-way recordings were not being made.

The transcript discloses that at approximately 2155 hours the tower personnel asked the crew of the airplane, "Can you see many runway lights looking down the runway turned on high intensity." One of the controllers testified that a member of the crew answered, "Three lights", and then asked how far apart the lights were. The transcript further discloses that the tower operator replied that the lights were about 300 feet apart; the fact being that the runway lights were approximately only 200 feet apart. This conversation occurred when the plane was at the threshold of the runway. The transcript also notes that before approaching the run-

way, and at about 2140, in response to inquiry from the crew, the tower operator advised the crew, "We've got everything wide open." Witnesses testified that this meant that all runway lights were on high intensity.

Prior to the take off, visibility conditions at the field were described by various witnesses who had been at the airport for many years, as the worst that had ever been experienced, and that objects could not be seen for more than 30 or 40 feet. Witnesses testified that after the crash, when driving down the runway to the scene of the disaster, they could barely make out the runway lights and had to be careful not to run over them. The runway was 150 feet wide and the lights were on each side of the runway.

There was little or no traffic at the airport. United Air Lines flights for both incoming and departing planes had been cancelled for some time before the crash.

There is no doubt that the cause of the crash was a stalling of the plane by reason of a premature take off. This premature take off was the result of the pilot losing his lateral bearings on the runway by reason of his inability to see the runway lights. The runway lights were probably obscured by drifting heavy fog patches.

The contentions of plaintiffs are, that:

1. Incorrect information supplied by the controller to the crew of the airplane, as to the distance between the lights on the runway, was a proximate cause of the crash, in that it caused the pilot to calculate erroneously the distance travelled on the runway, thereby resulting in a premature take off.

2. Incorrect information as to the distance between the lights on the runway misled the pilot as to existing visibility.

3. The controller should not have issued a take off clearance by reason of lack of visibility described by all witnesses as zero-zero.

4. The controller, pursuant to custom and practice, should have warned the

crew of the airplane not to take off because of the extreme lack of visibility. (Near the close of the trial the Government contended that this was not an issue as it was not spelled out in the pretrial order. However, it was discussed as an issue prior to the commencement of the trial.)

5. The controller had a duty to report to the pilot the deterioration in visibility which occurred between 2100 hours, when visibility was 1/16th of a mile in fog and the sky 7/10ths obscured, and 2133 hours when visibility was zero in fog and 9/10ths of the sky obscured. (A witness from the weather bureau testified that zero visibility is declared when the distance at which an object can be seen is less than one hundred and twenty-five feet.)

The Government contends that the sole proximate cause of the crash was the negligence of the pilot of the airplane, in that:

1. The pilot attempted to take off in violation of the minimum visibility standard established by Arctic Pacific for take off, which was one mile with a 300 feet ceiling or 3/4ths of a mile with a 400 feet ceiling. (The airport minimum for take off was one mile with a 300 feet ceiling.)

2. The airplane was overloaded by approximately fourteen hundred (1400) pounds; the maximum allowable take off weight for the airport was 46,850 pounds, and the actual weight at take off was 48,233 pounds.

3. The pilot did not properly burn out his engines prior to take off, thereby causing some of the spark plugs to foul, with a resulting loss of power.

The Government also contends that the controller, at the time of the crash, had no right, power, or duty under the then existing regulations, to deny take off clearance, and under the regulations there was no provision requiring or authorizing tower personnel to warn pilots not to take off because of weather.

The Government's position is that the incorrect information as to the distance between lights was not a factor in the crash.

■ The evidence does not support the Government's contention that the fouled spark plugs or the overloading of the aircraft contributed proximately to causing the crash.

The first question to be disposed of is whether the incorrect information as to the distance between the runway lights was a proximate cause of the crash.

The contention of plaintiffs that the pilot used this information to calculate the distance travelled on the runway so as to determine take off speed, is not supported by the evidence. The credible testimony is that, in an instrument take off, the air-speed indicator in the plane is used exclusively to determine the proper take off speed, and the distance travelled on the runway is not a factor.

The second facet concerning the misinformation presents a more difficult problem. The misinformation, in all probability, led the pilot to believe he could see a runway light for a distance of approximately 900 feet when, in fact, he could see a light only approximately 600 feet away. Whether the pilot would have aborted his take off if he had the correct information would be pure speculation as the misinformation was given to him only about three minutes before his actual take off. However, the inquiry from the tower highlights the concern the controller felt regarding visibility. In the accident report the following entries appear:

"0300 pilot requested takeoff and was asked how many runway lights were visible.

Pilot advised 'three.'

0301 N 1244 N was cleared for takeoff."

■ It is not necessary to pass upon plaintiffs' contention that the tower should have reported the decreased visibility which occurred between 2037 and 2133 hours when the visibility dropped from 1/16th of a mile to zero. While in the interest of safety to the aircraft the controller should have advised the pilot of the decrease in visibility, this omission

could not be said to be a proximate cause of the crash inasmuch as the pilot was in a position to make the same observation as the controller.

■ In considering whether the controllers should have warned the pilot not to take off, or denied clearance, a review of the evidence and the regulations compels the the conclusion that the controllers were negligent in failing to deny clearance. They were further negligent in failing to warn the pilot not to take off and that if he did he would be breaking the law. In fact the controllers knowingly assisted the pilot in violating a regulation which prohibited a take off when visibility was below certain minimums. 14 C.F.R. § 42.55.

■ Contrary to the contention of the Government, the controller knew, or should have known, that the airplane was a "Part 42" aircraft carrying passengers. The flight plan filed with the controllers noted that there were forty-eight persons aboard the plane.

■ Pursuant to section 205 of the Civil Aeronautics Act of 1938, 49 U.S.C. § 425 (1938) and section 307 of the Federal Aviation Act of 1958, 49 U.S.C. § 1348, there have been promulgated a maze of regulations governing all phases of aviation. Pertinent parts of such regulations which were in effect on October 29, 1960, are found in 14 C.F.R., revised as of January 1, 1961, and are noted.[4] These regulations have the force

4. "PART 26—AIR-TRAFFIC CONTROL TOWER OPERATOR CERTIFICATES

§ 26.26 Exercise of authority. ·

A certificated air traffic control tower operator shall control traffic in accordance with the procedures and practices as prescribed in the appropriate air traffic control manuals of the Federal Aviation Agency to provide for the safe, orderly and expeditious flow of air traffic in accordance with the following requirements:"

"PART 60—AIR TRAFFIC RULES

§ 60.43 Air traffic clearance.

Prior to operating in controlled airspace, an air traffic clearance shall be obtained from air traffic control.

[Amdt. 60–7, 22 F.R. 7898, Oct. 4, 1957; Amdt. 60–8, 22 F.R. 8527, Oct. 29, 1957]"

"PART 42—IRREGULAR AIR CARRIER AND OFF-ROUTE RULES

§ 42.55 Weather minimums.

No flight shall be started unless the take-off, en route operation, and landing at destination can be conducted in accordance with the weather requirements of Part 60 of this subchapter,[7] but in no case less than the minimums specified below:

(a) * * *

(b) For IFR operations the weather minimums, including alternate airport requirements, shall not be less than those specified in Parts 609 and 610 of this title, or as otherwise specified or authorized by this Administrator. These weather minimums, including alternate airport requirements, also may be found in the Approach and Landing Charts and Radio Facility Charts of the Coast and Geodetic Survey and in the Airman's Guide.

7. See Parts 609 and 610 of this title, or refer to the Approach and Landing Charts and Radio Facility Charts of the Coast and Geodetic Survey, and to the Airman's Guide for specific en route, take-off, and landing minimums for particular routes and airports."

"§ 42.56–2 Take-off and landing weather minimums (F.A.A. rules which apply to § 42.56).

(The rules which apply to this section are the same as those stated in § 40.406–1 of this subchapter.)"

"PART 40—SCHEDULED INTERSTATE AIR CARRIER CERTIFICATION AND OPERATION RULES

§ 40.406–1 IFR take-off and landing, and instrument approach procedure, weather minimums

(FAA interpretations which apply to § 40.406).

(a) General. The ceiling and visibility contained in the main body of the latest weather report furnished by the U. S. Weather Bureau or a source

and effect of law inasmuch as they were enacted in accordance with the Administrative Procedures Act, 5 U.S.C. §§ 1001–1003.

■ On October 29, 1960, there was in effect a manual designated as "ANC Procedures for the Control of Air Traffic," 3rd ed. 1957, known as "ANC/PCAT Manual." This manual specifies air traffic control procedures for army, navy and civilian aircraft. These procedures, since 1958, have been under the auspices of the Director, Bureau of Air Traffic Management of the Federal Aviation Agency. The instructions in this manual were not promulgated in accordance with the Administrative Procedures Act, therefore, the regulations control over any conflicting provisions in the manual.

The pertinent parts of sections in the manual are noted.[5]

> approved by the Weather Bureau will control for instrument approach procedures and landings and take-offs for all runways of an airport, except as provided in paragraph (b) of this section."
> "PART 609—STANDARD INSTRUMENT APPROACH PROCEDURES.
> § 609.2 Applicability.
> Unless otherwise authorized by the Administrator, the procedures and minimums prescribed in this part shall apply as follows:
> (a) * * *
> (b) The IFR takeoff minimums are applicable to all users of the airport while conducting operations under the authority of Parts 40, 41, 42, 44, or 45 of this title."

———◆———

5. "Foreword
"These procedures are to be observed by air traffic control personnel of Army, Navy, Air Force, CAA and other civil air traffic control agencies. However, instances will arise where air traffic can be controlled more efficiently and safely by deviation from these standards. In such cases, controllers on duty are expected to use their best judgment."
"1.0300 Objective: The primary objective of the Air Traffic Control service shall be to promote the safe, orderly, and expeditious movement of air traffic. This shall include:
(1) Aiding pilots in preventing collisions between aircraft and between aircraft and obstructions on the movement area.
(2) Expediting and maintaining an orderly flow of air traffic.
(3) *Assisting the person in command of an aircraft by providing such advice and information as may be useful for the safe and efficient conduct of a flight.* [Emphasis added.]
(4) Notifying appropriate organizations regarding aircraft known to be or believed to be in need of search and rescue aid, and assisting such organizations as required."
"2.1300 General: Clearances are based solely on expediting and separating air traffic and do not constitute authority to violate Civil Air Regulations. Clearances authorize flight within control zones and control areas only; no responsibility for separation of aircraft outside of these areas is accepted."
"3.401 A clearance issued by an airport traffic control tower is authority for a pilot to proceed only insofar as known air traffic conditions and field conditions are concerned and does not constitute authority for a pilot to violate any provision of Military or Civil Air Regulations. The relay of information or advice to pilots from the airport management or a commanding officer is permitted. When such relay of advice is undertaken by controllers, the pilot shall be informed of the source of the message. However, denial of clearance for take-off shall be based only on considerations of traffic. No violations of 60.19 of the Civil Air Regulations shall be reported unless a take-off is made contrary to a controller's clearance based solely on traffic conditions."
"*3.4010 Clearances issued by airport traffic controllers are predicated upon known or observed traffic and field conditions which, in the judgment of the controller, affect safety in aircraft operations. Such known traffic conditions will include not only known aircraft in the air within the control zone and on the movement area over which control is being exercised, but also any known or observed vehicular traffic or other obstructions not permanently installed on the movement area in use."
"3.4141 The take-off clearance, as the name implies, is issued after the pilot has taxied to the end of the runway in use, tested his engines, and is ready for

Some confusing and conflicting instructions pertaining to take off clearances, evidently referring to aircraft other than passenger and cargo carriers, were issued by various department heads to regional directors on March 25, 1960,[6] April 27, 1960,[7] and July 28, 1960.[8] Finally, as the result of the instant crash,

take-off. The pilot has previously received information on the runway in use, wind direction and velocity, the altimeter setting, time check, and the appropriate air route traffic control clearance. He is now interested in obtaining authorization to commence his take-off, and he needs information on such local traffic as may affect his flight or which he may approach while in flight within the control zone."

6.

"FEDERAL AVIATION AGENCY
WASHINGTON 25, D. C.

March 25, 1960

*CIRCULAR LETTER*

TO : Chief, Air Traffic Management Field Division, Nos. 1–4 Acting Regional Manager, Regions 5 and 6

FROM : Director, Bureau of Air Traffic Management

SUBJECT: Withholding of Take-Off Clearance to General Aviation Aircraft Operating Under *Instrument Flight Rules*

It has been reported several times recently that airport traffic controllers have withheld or denied take-off clearances to general aviation aircraft, intending to operate on an *IFR* flight plan, on the basis that the weather was below take-off minimums. There is a possibility that Circular Letter ATM–31, dated October 7, 1959, may have been misinterpreted by personnel. ATM–31 applies to special *VFR* operations in control zones and not IFR operations.

So that there will be no further misunderstanding, the following is a review of the pertinent facts, particularly as they relate to general aviation category operations.

1. The Federal Register, Volume 22, Number 134, Part II, dated July 12, 1959, Part 609 of Title 14, Chapter II of the code of Federal Regulations says:

609.2 (b) the IFR take-off minimums are applicable to all users of the airport while conducting operations under the authority of Parts 40, 41, 42, 44 or 45 of this title.

It should be noted that Part *43* of Civil Air Regulations is excluded.

2. Civil Air Regulations, Part 43 which pertains to the general aviation group, defines *instrument flight limitations* in section 43.65 as:

No person shall pilot an aircraft under instrument flight rules or in weather conditions less than the minimums prescribed for flight under visual flight rules unless he holds a currently effective instrument rating issued by the Administrator."

7.

"FEDERAL AVIATION AGENCY
AIR TRAFFIC MANAGEMENT
WASHINGTON, D. C. 4/27/60

*ROUTINE*

FAA

CHIEF, AIR TRAFFIC MANAGEMENT FIELD DIVISION, NOS. 1–4 ACTING REGIONAL MANAGER, REGIONS 5 AND 6

AT–200–153. REF AT–1 LETTER DATED MARCH 25, 1960 SUBJ: WITHHOLDING OF TAKE-OFF CLEARANCE TO GENERAL AVIATION AIRCRAFT OPERATING UNDER IFR. PLEASE CANCEL NEXT TO LAST PARAGRAPH SINCE THIS CONTRADICTS AMENDMENT TO ANC/PCAT CONTAINED IN AT–300–21 DATED SEPTEMBER 21, 1959. PLEASE ADVISE RECIPIENTS OF REFERENCE LETTER.

/S/Carhart
for CHANDLER, AT–200 272015

LIPEARCE: rg, AT–220, x46S3"

a clarifying instruction pertaining to all aircraft, was issued on February 7, 1961. The instruction of February 7, 1961, was not produced; however, a restatement dated March 7, 1961, was.[9]

**8.**

"FEDERAL AVIATION AGENCY
WASHINGTON 25, D. C.

July 28, 1960

ATM CIRCULAR NO. AT–200–4

TO : Chief, Air Traffic Management Field Division No. 1–4 Regional Manager, Region 5 and 6

FROM : Chief, Field Operations Division

SUBJECT: Withholding of Take-off Clearance to General Aviation Aircraft Operating Under Instrument Flight Rules

The purpose of this Circular is to reissue and clarify the information issued in AT–1 Circular Letter dated March 25, 1960, and ARMES 272015, April 1960, both of which are hereby cancelled.

AT–1 Circular Letter dated March 25, 1960, as revised by ARMES 272015, April 1960, was issued on the basis of reports that general aviation aircraft, intending to operate on an IFR flight plan, were denied or had their take-off clearance withheld on the basis that the weather was below their minima. These reports indicated that the provision of Circular Letter ATM–31, dated October 7, 1959, dealing with special VFR operations in control zones may have been erroneously applied to IFR operations.

The pilot of an aircraft is responsible for the safe operation of his aircraft at all times. This includes proper consideration of the various conditions under which a particular flight may be conducted legally. Of particular importance is the fact that there are no current take-off weather minima applicable to aircraft operated under the rules governing aircraft in the general aviation category.

Controllers, while required to be cognizant of the weather minima shown on the C&GS and ACIC Approach and Landing Charts for their areas of responsibility, are not required to be familiar with the specific minima governing each individual IFR flight. Further, they do not have the authority, using weather as a basis for such authority, to withhold or deny the issuance of a clearance to the pilot of an aircraft.

This Circular may be cancelled when it has been noted by all control personnel. It has been distributed to ATM facilities, Resident Air Traffic Management Specialists, and Air Traffic Supervisors.

(s) Henry S. Chandler, AT–200

AT–220

**9.**

"FEDERAL AVIATION AGENCY
Washington 25, D.C.

March 7, 1961

ATM CIRCULAR NO. AT–300–16

TO : Chief, Air Traffic Management Field Division No. 1–4 Regional Manager, Region 5 and 6

FROM : Chief, Regulations & Procedures Division

SUBJECT: Withholding Take-off Clearance

I. *PURPOSE*

To restate the information contained in GENOT 1/30, dated 271540 February 1961 and thereby cancel the same.

II. *PROCEDURES*

Effective immediately, Airport Air Traffic Control Specialists shall deny take-off to any air carrier or other commercial aircraft operated for the purpose of carrying passengers or property for compensation or hire when the prevailing visibility for the airport of departure or runway visibility for the departure runway is less than one quarter of a mile or runway visual range is less than two thousand feet.

If, upon being refused a take-off clearance, a pilot of an aircraft in the above category advises he is not carrying passengers or property for compensation or hire, for example, a business aircraft carrying com-

The instruction of April 27, 1960, does not help to clear up the confusion. It refers to a conflict between AT–300–21, dated September 21, 1959, and the next to the last paragraph in the instruction of March 25, 1960. These two documents do not closely relate to the same subject matter. The AT of September 21, 1959, was either not produced, or the author of the instruction of April 27, 1960, was utterly confused.

Other than the controllers involved in the incident, no working air traffic controller was produced as a witness. The Government, however, did call a witness who had been a controller and a supervisor from 1946 to 1956, and in 1958 was assigned to the Special Investigation branch of the Federal Aviation Agency, and became branch chief in 1961. He testified in effect that the air traffic controller could not, under regulations existing at the date of the incident, deny clearance for an IFR flight because of weather; that an air traffic controller controlled aircraft only to the extent necessary to separate planes for the purpose of avoiding collisions; and, as of October 29, 1960, the sole responsibility for take off rested with the pilot. He further testified that the controller had no way of knowing the minimums of the departing plane. This latter statement by the witness was irrelevant for the reason that visibility at the field at the time of the take off was below the minimums for all aircraft carrying passengers. While this witness had an impressive background, there was an indication of lack of candor in failing to mention and explain the AT's noted as 6, 7 and 8, which were not produced until after he testified.

If, as the witness implied, the air traffic controllers had no authority pursuant to the then existing regulations and instructions, to deny clearance to the plane under the circumstances disclosed, then the Administrator of the FAA was negligent in failing to issue proper and clear instructions in accordance with congressional mandates. These mandates, contained in 49 U.S.C. §§ 1348(a) and 1421(b) requires the Administrator to issue rules and regulations which "he may deem necessary in order to insure the safety of aircraft * * *," and requires him to perform his duties "in such manner as will best tend to reduce or eliminate the possibility of, or recurrence of, accidents in air transportation." However, the finding is that under the then existing regulations and instructions, the controllers definitely had the power and duty to deny clearance under the extreme conditions that existed, and further, there was a duty pursuant to custom and practice to warn a pilot not to take off where weather conditions are adverse.

The testimony of experienced and competent pilots called by both parties is highly conflicting regarding the right and duty of air traffic controllers to deny clearances to aircraft because of weather. It is also conflicting as to whether there was a custom and practice in the United States for controllers to warn aircraft not to take off because visibility was below minimums. Perhaps the conflict can be explained by the fact that some of the pilot witnesses never attempted to take off when visibility was below their minimums. The conflict perhaps could have been best resolved if the Government had produced working controllers as witnesses.

In an attempt to resolve the conflict the court appointed an experienced pilot as the court's expert. He testified that according to his understanding a controller had no authority to deny clearance to aircraft because of weather, but that there was a practice by controllers to

pany employees or an air carrier aircraft on a ferrying or training flight. take-off clearance may be authorized, based on traffic conditions.

III. *MISCELLANEOUS*

This Circular is being distributed to all ATM facilities, Resident ATM Specialists and Air Traffic Supervisors.

(s) Robert I. Gale, AT–300"

AT–385

X 534

warn pilots not to take off when visibility was below certain minimums. In part, he testified:

"Q The instances—let me ask one or two questions about these instances you have described:

I take it these are instances, first of all, in which the pilots were in effect warned by somebody in the tower that the weather was below their minimums?

A Yes, sir.

Q And this would be a fair characterization, is it true, as to the five or six instances that you have told us about here today?

A Yes, sir.

Q And of those, you have no present way of approximating—or do you, sir—how many of the five or six occurred before October 29, 1960, and how many afterwards?

A Well, the times I was referring to were all prior to 1960. The practice still continues."

Captain Chesher, the deceased pilot, believed that the controller could deny clearance. A witness who fueled the plane testified to a conversation with Captain Chesher which took place during the fueling process shortly before the engines were started. The witness stated that Chaptain Chesher commented on how foggy it was and wished the busses transporting the football team had not showed up. The captain then remarked that maybe the tower would not let him take off.

A witness who was present when the take off clearance was given, and who had been the station agent for United Air Lines at the Toledo Express Airport for ten years, testified:

"A No; the thing that caught my attention was just that fog. It seemed to catch my attention because when I heard the signal, cleared for take-off, I of course knew about the fog and that everything else had been cancelled out that night and we had not had any planes coming in or going out and I just—it just seemed unusual.

Q By unusual you mean that a plane was going to take off in that weather?

A That's right.

Q Were you surprised that the Tower gave the transmission, 'cleared for take-off,' in that weather?

A Yes; I think I was surprised."

The deposition of the senior controller who had charge of the tower, and who had been employed as a controller since 1946, was introduced in evidence and contains, in part, the following:

"Q Have you ever while you were not in the Tower heard anybody refuse to issue clearances because of weather conditions?

A I don't remember.

Q You don't remember whether you have or whether you haven't?

A That's right. I don't know.

Q Have you ever refused to give clearance while you were in the Tower prior to this accident to any aircraft because of any other conditions other than weather?

A I don't remember.

Q You didn't ever refuse clearance to anyone who asked you for it, did you?

A I don't remember.

Q Do you remember anybody else in the Tower while you were present ever refuse clearance to anyone who asked for it?

A I don't remember.

Q You don't remember either way, either yes or no?

A That's correct."

The other controller in the tower, who was also rated as a senior air traffic controller, and who had been employed as a controller for many years by the Agency, when asked why he, without a request from the pilot, gave the pilot the actual magnetic heading of the runway, stated, he did not know why he did.

The only plausible explanation as to why this controller furnished the pilot with the magnetic heading of the runway

was to assist and enable the pilot to take off purely on instruments, relying on his gyro-compass for direction instead of ground visibility. This is a highly dangerous maneuver employed almost solely by the military in training operations and under emergency wartime conditions.

Attached to a memorandum filed by the Government on April 28, 1967, as Appendix III, is a partial transcript of a congressional hearing in 1964 on air safety. At page 159 of the Appendix, in response to an inquiry from a congressman, General William T. Seawell, retired Air Force General appearing evidently for Eastern Air Lines, expressed the opinion that the FAA had the authority to close an airport because of extreme weather conditions.

The Government argued that an airport can only be closed because of weather by the operator of the airport. However, no evidence to support this argument was introduced.

A perusal of the transcripts of the congressional hearings explains the reasons for the opposition of the scheduled airlines to controls by the FAA, these being that they have a dispatcher who keeps informed on all conditions, and before a plane takes off both the pilot and the dispatcher must agree on the course of action to be taken. In the instant situation there was no such built-in safety device.

The Government argued that the pilot was adamant in his decision to take off, and would have taken off regardless of any warning by the controller. This argument is dispelled by the utterance of the pilot shortly before take off to the effect he hoped that they would not let him take off. A fair inference can be drawn from the evidence that if the pilot had been told or warned not to take off, he could have justified to Arctic Pacific (which was in sore financial straits) the expense necessary to board and lodge the passengers during the delay.

██ ██ If this were an action between the personal representative of the pilot and the United States, there would be no question that there could be no recovery for the pilot's death, because of the pilot's gross negligence. However, the pilot's negligence cannot be imputed to the passengers. The controllers owed a duty of care to the passengers, and this duty was not fulfilled by assisting the pilot in conducting a most dangerous and perilous maneuver. The controllers were more than passively negligent, and their negligence was a proximate cause of the tragedy. They were guilty of negligence in a high degree, and were guilty of violating their own procedures set forth in 1.0300(3) of the ANC/PAC Manual which provides that the primary objective of Air Traffic Control Service shall be to promote the safe, orderly, and expeditious movement of air traffic by, *"Assisting the person in command of an aircraft by providing such advice and information as may be useful for the safe and efficient conduct of a flight."* [Emphasis added.] This provision was formerly contained in Part 617 of 14 C.F.R. § 617.-4, as noted at page 397 of *Wiener*, infra.

In Eastern Air Lines v. Union Trust Co., 95 U.S.App.D.C. 189, 221 F.2d 62 (1955), although not factually in point, the court, at page 65, states the general concept of tower control as—

"An incoming plane may not land and a departing plane may not take off until it receives tower permission to do so."

In United Air Lines, Inc. v. Wiener, 335 F.2d 379 (9th Cir. 1964), cert. dismissed, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1965), in answer to practically the same argument that the Government here makes, to the effect that a pilot is solely responsible, the court, in its excellent and well considered opinion, states, at page 397 of 335 F.2d:

" * * * we do not agree that the rule requiring pilot vigilance *'logically* and *necessarily* negated and precluded any and all alternative rules, practices or customs for the reason that any such alternative would detract from the effectiveness of the rule.' "

The foregoing proposition is restated in State of Maryland for use of Meyer v. United States, 257 F.Supp. 768, at page 773 (D.C.D.C.1966):

"It is claimed by Government counsel that the primary duty for the safety of his aircraft rests on the pilot. There is obviously no doubt that the pilot is under an obligation to use a high degree of care and vigilance in navigating his airplane. This obligation, however, does not detract from the reciprocal duty devolving on other persons, such as the controllers in the Traffic Control Center. As has been already stated, negligence of two or more persons may concur in causing an accident, and in that event each is liable for the result."

In the recent case of Ingham v. Eastern Air Lines, Inc. v. United States, 373 F.2d 227, at pages 235–236, (2nd Cir. 1967), the court, in commenting upon the duty owed to passengers by controllers, states:

"Our conclusion that the change in visibility should have been reported is in tune with the heavy degree of reliance which passengers place upon the government for insuring the safety of their flights. While air travel in this jet age has become commonplace, we know too well that there is always lurking the possibility of tragic accidents capable of snuffing out the lives of hundreds in a mere matter of seconds. Much of the success in preventing such disasters can be attributed to the federal government's assumption of the supervision of commercial flying; and public confidence in air travel has been fostered in large measure by knowledge that our government, recognizing the high stakes involved, is constantly overseeing the carrier's operations in order to promote safety."

The claim of the Government that the function of the tower to deny clearance or warn the pilot is discretionary, is answered fully in *Wiener* and *Ingham,* supra. The Government's function to operate the tower is discretionary but it does not have the discretion to operate it negligently.

The following motions, filed by the United States on September 14, 1966, came on for hearing on October 13, 1966, in six cases noted: [10]

(1) To quash service of process (Alias Summonses).

(2) To dismiss on the grounds of lack of jurisdiction.

(3) To dismiss for want of prosecution.

The motions were submitted, and the ruling was postponed until after determination of liability.

The complaints in all of the cases were filed in October of 1961. Summonses in the six cases were not served on the United States until July 6, 1966, when alias summonses were served. The marshall had returned the original summonses unexecuted to the clerk in January of 1962 for the reason that no instructions for service had been received. Service on the United States in the other twenty-seven cases was properly effected.

The Government alleges that it is prejudiced by the delay in service. This claim is not supported factually.

10. Civil No. 3595–SD–K Gilbert Harold Stork, etc., et al. vs. United States of America, et al.

Civil No. 3596–SD–K Harry J. Morris, etc. vs. United States of America, et al.

Civil No. 3597–SD–K F. Sheldon Harden vs. United States of America, et al.

Civil No. 3598–SD–K Leroy B. Hughes vs. United States of America, et al.

Civil No. 3599–SD–K Howard R. O'Daniels vs. United States of America, et al.

Civil No. 3600–SD–K Walter G. Williamson vs. United States of America, et al.

The United States Attorney in Los Angeles had knowledge of the existence of these cases since their filing, which was about the same time as the other twenty-seven cases in which the United States was properly served. The Government was also aware of the filing of the declaratory relief action filed in June of 1961, in which all plaintiffs here were named defendants. All activity and discovery took place in the declaratory relief action from 1961 until 1966, when it was finally settled. The United States Attorney in Los Angeles was always in close contact with the progress in the declaratory relief action.

 The United States Attorney claims prejudice in that their ability to defend against the injury and damage aspect of the claims is impaired.

Plaintiffs alleged in their reply memorandum that the Government, prior to July of 1966, has made no effort to determine damages in any of the cases. This allegation was not denied by the Government in any reply memorandum or in the argument.

The Government relies on Messenger v. United States, 231 F.2d 328 (2nd Cir. 1956), and plaintiffs upon Rollins v. United States, 286 F.2d 761 (9th Cir. 1961), and Huffmaster v. United States, 186 F.Supp. 120 (N.D.Cal.N.D.1960). On the basis that there was no prejudice to the United States on the question of liability, and no facts shown that the United States will be prejudiced on the question of damages, the motions are denied.

This memorandum shall constitute the findings of fact and conclusions of law on the question of liability.

Counsel may file objections to these findings within ten days from date hereof.

A further hearing is set for Friday, July 28, 1967, at 2 o'clock P.M. for the purpose of outlining procedures, and setting hearing dates for the further trial of the cases on the issue of damages.