430 F.2d 1104
 Gilbert Harold STORK et al., Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant-Appellant.
Donald R. ADAMS et al., Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant-Appellant.
Eva LEDBETTER, Plaintiff-Appellee,
v.
UNITED STATES of America, Defendant-Appellant.
James L. FAHEY, Plaintiff-Appellee,
v.
UNITED STATES of America, Defendant-Appellant.
Alfred E. TOLLNER, Jr., Plaintiff-Appellee,
v.
UNITED STATES of America, Defendant-Appellant.
 No. 23001.
 No. 23460.
 No. 23461.
 No. 23468.
 No. 23469.
 United States Court of Appeals, Ninth Circuit.
 July 28, 1970.
 Rehearing Denied September 4, 1970.
 
 No. 23001:
 Leonard Schaitman (argued), Robt. V. Zenner, Attys., Wm. D. Ruckelshaus, Asst. Atty. Gen., Civil Division, Dept. of Justice, Washington, D. C.; Harry D. Steward, U. S. Atty., San Diego, Cal.; Donald A. Fareed, Special Asst. U. S. Atty., Los Angeles, Cal., for appellant.
 Seymour Ellison (argued), Melvin Belli, of Belli, Ashe, Ellison, Choulos & Lieff, James Hagedorn (argued), of Hoberg, Finger, Brown & Abramson, San Francisco, Cal., Pizante & Gregg, Beverly Hills, Cal., for appellees.
 No. 23460:
 James L. Browning, U. S. Atty., San Francisco, Cal., Weinmann, Rode, Burnhill & Moffitt, Oakland, Cal., for appellant.
 Seymour Ellison (argued), of Belli, Ashe, Ellison, Choulos, Cone & Harper, San Francisco, Cal., Pelletreau, Gowen, Moses & Porlier, San Pablo, Cal., for appellees.
 No. 23461:
 James L. Browning, U. S. Atty., San Francisco, Cal., Wm. D. Ruckelshaus, Asst. Atty. Gen., Leonard Schaitman (argued), Civil Division, Dept. of Justice, Washington, D. C., for appellant.
 Seymour Ellison (argued), of Belli, Ashe, Ellison, Choulos, Cone & Harper, San Francisco, Cal., John B. Kramer, Oakland, Cal., for appellee.
 Nos. 23468, 23469:
 Leonard Schaitman (argued), Robt. V. Zener, Attys., Wm. D. Ruckelshaus, Asst. Atty. Gen., Civil Division, Dept. of Justice, Washington, D. C., Cecil F. Poole, U. S. Atty., San Francisco, Cal., Weinmann, Rode, Burnhill & Moffitt, Oakland, Cal., for appellant.
 Seymour Ellison (argued), of Belli, Ashe, Ellison, Choulos, Cone & Harper, San Francisco, Cal., for appellee.
 Before CHAMBERS, MERRILL and KOELSCH, Circuit Judges.
 MERRILL, Circuit Judge:
 
 
 1
 Plaintiffs-appellees secured judgment against the United States under the Federal Tort Claims Act for damages for injuries resulting from an airplane crash at the Toledo (Ohio) Express Airport on October 29, 1960.[1] This appeal by the United States concerns solely the issue of liability of the United States.[2] The dispute focuses on what duty, if any, rested upon control tower personnel (as agents of the Federal Aviation Administration) to forbid or warn against the fatal take-off.
 
 
 2
 The facts are given in detail in the opinion of the District Court, 278 F. Supp. 869, 872-874 (S.D.Cal.1967), and are briefly summarized below. The plane was a Super C-46F, an aircraft operated by Arctic-Pacific, Inc., a now defunct nonscheduled air carrier licensed by the FAA.[3] On this occasion it had been chartered by the California State Polytechnic College (Santa Maria) to transport the college football team to and from Toledo.
 
 
 3
 The return flight was to leave Toledo in the early evening on October 29. Approximately half an hour before takeoff, visibility at the airport was 1/16 of a mile; at the time of take-off it had fallen to "zero miles in fog," i. e., less than 165 feet. Scheduled flights normally operating out of the Toledo airport had been canceled; witnesses described the weather as the worst in memory. For over an hour before the Arctic-Pacific take-off no other aircraft had sought clearance.
 
 
 4
 FAA regulations prescribe visibility minimums for various aircraft, including those operating under license as nonscheduled air carriers.[4] At the time of the take-off and for at least an hour before, the visibility at the Toledo airport was below minimums for any such aircraft. Consequently, take-off was prohibited by the FAA regulations, 14 C.F.R. § 42.55.
 
 
 5
 In conversation with refueling personnel prior to take-off, the pilot expressed the wish that the buses carrying the team had not shown up at the airport, and the thought that "maybe the tower wouldn't let him take off." Nevertheless, the pilot filed his flight plan and at 9:30 p. m. requested and was granted taxi clearance. Refueling personnel with flashlights assisted in directing the plane down the ramp to the entrance of the taxiway. The plane was cleared to a runway and given the runway's magnetic bearing. At the runway threshold, in response to a tower inquiry, the pilot advised that looking down the runway he could see three runway lights. (The lights were on high intensity and were spaced 200 feet apart.)
 
 
 6
 The aircraft was cleared for take-off at 10:01 p. m. without further comment from the tower. According to testimony, the lack of visibility appeared to make it difficult to control the take-off roll. The plane swerved abruptly to the right and then to the left. It made a lurching premature lift-off and, after attaining an altitude of 50 to 100 feet, stalled and crashed on the runway. The aircraft was demolished. Twenty of the 48 persons aboard, including the pilot and copilot, were killed or fatally injured. The rest sustained injuries of varying degrees.
 
 
 7
 At trial an experienced pilot, court appointed as an expert witness, testified that according to his understanding a controller had no authority to deny clearance to an aircraft because of weather, but that there was a practice by controllers to warn pilots not to take off when visibility was below certain minimums. Considerable other, often conflicting, testimony on the duty of controllers to deny take-off or to warn was presented. In its opinion the District Court stated:
 
 
 8
 "* * * [T]he finding is that under the then existing regulations and instructions, the controllers definitely had the power and duty to deny clearance under the extreme conditions that existed, and further, there was a duty pursuant to custom and practice to warn a pilot not to take off where weather conditions are adverse." 278 F.Supp. at 879.
 
 
 9
 In its appeal the United States insists that under applicable regulations and instructions clearance cannot be denied for reasons of weather; that the controllers' concern is limited to traffic conditions and that judgment as to weather conditions, once all relevant information is at hand, is the sole responsibility of the pilot. On this basis, the United States rejects either a duty to deny take-off clearance or a duty to warn.
 
 
 10
 Regulations and procedures of the FAA dealing with the functions of air traffic controllers are set forth in the District Court opinion, 278 F.Supp. at 875-879. This collection of regulations, "ANC Procedures" and FAA circulars is far from clear in its bearing on the problem here presented. It is apparent, however, that some division of responsibility, such as is asserted by the United States, is intended. As we read the regulations and "ANC Procedures for the Control of Air Traffic," judgment as to whether and when traffic conditions permit take-off is for the controller; judgment as to whether and when weather conditions permit take-off is for the pilot, and traffic controllers have no authority to substitute their own judgment in denying take-off clearance.[5] We have no quarrel with the proposition that in the interests of air safety such a fixing of responsibility for judgment is desirable and that this division should be respected.
 
 
 11
 Here, however, there was no room for exercise of judgment by anyone. This flight was flatly forbidden by regulation. Any denial of leave to take off would not rest on an order from the tower issued pursuant to its authority but upon FAA regulations governing the operation of aircraft. This was no borderline case, calling for an exercise of judgment by the controllers as to whether the minimums of a particular aircraft had been reached. It called for no factual investigation. There was no need for tower personnel to take time from the pressing demands of their duties respecting traffic control to ascertain whether the regulations were being violated. It was obvious that the aircraft was carrying passengers for hire,[6] and that take-off under prevailing conditions would be in violation of 14 C.F.R. § 42.55.
 
 
 12
 The United States insists that even under these extreme circumstances controllers cannot deny clearance. A grant of clearance, the United States argues, says no more than that traffic conditions will not endanger take-off. At the time[7] there was considerable support for this position lurking in the regulations and it may well be that this is all a grant of clearance was meant to say. If so, this limitation on its meaning was not clearly apparent. Clearance could also reasonably be read to constitute a reliable official invitation to proceed. It would appear that it was so read by this pilot. We need not, then, question the Government's assertion that under the regulations "clearance" is a word of art with narrow significance. Even accepting this construction of the term, traffic clearance should not have been granted without accompanying it with a clarifying warning that despite favorable traffic conditions the flight was forbidden by regulation.[8]
 
 
 13
 The United States insists that warnings from the tower are not required when it is apparent that the pilot is in possession of all the facts known to the controllers. As we have noted, however, warning here would have served to remove any ambiguity that might otherwise have attached to an unqualified grant of clearance. Further, even assuming that the pilot is aware of the fact that clearance talks only in terms of traffic, his apparent knowledge will not obviate the need for warning when he is proceeding in the face of extreme danger known to the tower. United States v. Furumizo, 381 F.2d 965 (9th Cir. 1967). As there stated:
 
 
 14
 "* * * [T]he regulations and manual do not make mere automata of the controllers. Their job requires that they act in the interest of safety. * * *" 381 F.2d at 968.
 
 
 15
 Cf. Ingham v. Eastern Airlines, Inc., 373 F.2d 227, 235-236 (2d Cir.), cert. denied, 389 U.S. 931, 88 S.Ct. 295, 19 L. Ed.2d 292 (1967).[8]
 
 
 16
 For the pilot here to request clearance for take-off under the circumstances was clear indication to the tower that something was amiss as a consequence of which the lives of passengers and crew were in grave danger and that warning was required. Any assumptions on which deference to the judgment of the pilot can normally rest were refuted by the events themselves.
 
 
 17
 We conclude, as did the District Court, that silence under these extraordinary circumstances constituted a breach of duty on the part of air traffic control personnel.
 
 
 18
 We find no merit in the contention of the United States that this breach of duty was not a proximate cause of the crash. It is clear from the record that take-off was in reliance upon the unqualified grant of clearance by the tower, and that even the most cursory statement of caution might have caused the pilot to abandon the fatal take-off. It was sufficient in Ingham v. Eastern Airlines, Inc., supra, that the availability of further weather information might have caused the pilot there to decide to abandon his attempt at landing. 373 F. 2d at 237.
 
 
 19
 The judgment of the District Court is affirmed.
 
 
 
 Notes:
 
 
 [1]
 These cases include 28 consolidated cases from the Southern District of California and 5 cases from the Northern District in which the liability issues were separately tried. 278 F.Supp. 869, 871 n. 1, 872 n. 2. (S.D.Cal.1967)
 
 
 [2]
 A settlement with the insurance carrier of the operator of the plane, Arctic-Pacific, Inc. was reached whereby the insurer paid to plaintiffs herein an average of about 50 per cent of the per seat contractual liability of $25,000, for a total of about $500,000. The Government's attempt to secure a ruling ordering indemnity by the carrier failed and is not being appealed. The delay in bringing these cases to trial was due largely to a declaratory relief action brought by the insurance carrier against Arctic-Pacific, seeking to have the insurance contract declared void on breach of warranty grounds
 
 
 [3]
 "Irregular Air Carrier and Off Route Rules," 14 C.F.R., Part 42 (1960)
 
 
 [4]
 14 C.F.R. § 42.55 reads in part:
 "Weather Minimums. No flight shall be started unless the take-off, en route operation, and landing at destination can be conducted in accordance with the weather requirements of Part 60 of this Chapter, but in no case less than the minimums specified below. * * *"
 See also 14 C.F.R. § 42.55-3.
 
 
 [5]
 14 C.F.R. § 42.51-2 provides in part:
 "Responsibilities of the pilot in command * * * In addition to the responsibilities prescribed in this section, the pilot in command is responsible for:
 (a) Safe and efficient conduct of the flight to which assigned;
 * * * * *
 (c) Conducting the flight in accordance with the provisions of the air carrier's irregular air carrier operating certificate and the applicable Civil Air Regulations;
 (d) The exercise of good judgment in the planning of the flight;
 * * * * *
 See also ATM Circular No. AT-200-4, July 28, 1960, reproduced at 278 F.Supp. at 878.
 The "ANC Procedures for the Control of Air Traffic" manual provides in part:
 "2.1300 General. Clearances are based solely on expediting and separating air traffic and do not constitute authority to violate Civil Air Regulations."
 "3.401. A clearance issued by an airport traffic control tower is authority for a pilot to proceed only insofar as known air traffic conditions and field conditions are concerned and does not constitute authority for a pilot to violate any provision of Military or Civil Air Regulations."
 
 
 [6]
 The aircraft was of a type commonly used (in 1960) for carrying passengers, and the flight plan included the fact that there were 48 persons aboard. Moreover, the text of the circular quoted in note 7,infra, strongly indicates that it was proper for controllers to consider such aircraft as operating under rules regulating the carrying of passengers for hire unless advised to the contrary.
 
 
 [7]
 A few months after the Toledo crash, this absence was remedied by ATM Circular AT-300-16 (March 7, 1961), which provided in pertinent part as follows:
 "II. Procedures. Effective immediately, Airport Air Traffic control specialists shall deny take-off to any air carrier or other commercial aircraft operated for the purpose of carrying passengers or property for compensation or hire when the prevailing visibility for the airport of departure or runway visibility for the departure runway is less than one quarter of a mile or runway visual range is less than two thousand feet.
 If, upon being refused a take-off clearance, a pilot of an aircraft in the above category advises he is not carrying passengers or property for compensation or hire * * * take-off clearance may be authorized, based on traffic conditions."
 
 
 [8]
 The ANC procedures manual provides in part:
 "3.4010. Clearance issued by airport traffic controllers are predicated upon known or observed traffic and field conditions which, in the judgment of the controller, affect safety in aircraft operations." (Emphasis added.)
 This provision, too, implies that the controller is to be concerned with something more than simply directing traffic.
 KOELSCH, Circuit Judge (dissenting).
 In this case the government is mulcted without being legally at fault. I dissent.
 At the time of this accident, the pilot of an aircraft was the sole judge as to whether or when weather conditions would permit a take-off, and the traffic controllers possessed no authority to deny take-off clearance. Thus a controller (and hence the United States) could not be faulted — as the district court would do — for failing to deny such clearance.
 I am not prepared to hold that a traffic controller must give a pilot gratuitous advice concerning operation of the aircraft. In Furumizo (United States v. Furumizo, 381 F.2d 965 (9th Cir. 1967)), the facts made relevant a provision in the manual that expressly required the controller to give "precautionary information" to the pilot. No comparable provision in any regulation or the manual is applicable in this case. Nor do I subscribe to the proposition that a controller must anticipate that something is so "amiss" as to require a warning when a pilot requests take-off clearance.