[No. A036388. First Dist., Div. Three. Dec. 29, 1989.]

TERI BETHMAN et al., Plaintiffs and Appellants, v.
CITY OF UKIAH, Defendant and Respondent.

1396

COUNSEL

Thomas M. Witte and Elmendorf & Witte for Plaintiffs and Appellants.

Moris Davidovitz, Scott D. Raphael and Fisher & Hurst for Defendants and Respondents.

OPINION

**BARRY-DEAL, J.—**

## I. *Introduction*

This case arises from the crash of a small aircraft piloted by Fred Bethman on May 1, 1984, when he allegedly attempted an instrument landing[1] at

---

[1] An "instrument landing" refers to the following. The flight of general aviation aircraft may be conducted under either one of two different sets of flight rules—visual flight rules (VFR) or instrument flight rules (IFR). Under IFR, it is presumed that pilots are unable to see either other aircraft or the ground and are guided by air traffic controllers. Control of the aircraft is maintained by reference to various instruments on board, and navigation is accomplished through various electronic navigation aids, which receive and interpret data broadcast from ground stations. (*Redhead* v. *United States* (3d Cir. 1982) 686 F.2d 178, 180, fn. 1.)

An "instrument" or "instrument approach" landing refers to an IFR landing. Most instrument approach landing systems consist of one or more radio frequencies or signals which are

the Ukiah Municipal Airport (Airport) in the County of Mendocino. Beth-man and two passengers were killed when the aircraft crashed into moun-tainous terrain approximately four miles south of the Airport. His heirs, plaintiffs and appellants Teri Bethman, Kim Bethman, and Cindy Bethman (plaintiffs), filed the instant wrongful death action against the City of Ukiah (City) as the alleged owner of the Airport, and the County of Mendocino, based on an alleged dangerous condition of public property.[2]

This appeal concerns the preemption by the Federal Aviation Act of 1958, as amended (Act) (49 U.S.C. § 1301 et seq.),[3] of an action for damages based on state tort law against a city in its capacity as owner of an airport. We conclude that where a claim of a dangerous condition of property is based on airport navigation facilities which, as a matter of law, are regulat-ed, approved, and controlled pursuant to the Act and its comprehensive corresponding federal regulations, such claim is preempted by the Act. We therefore affirm the judgment of dismissal.

## II. *The Complaint and the Demurrer*

■ The function of a demurrer is to test the sufficiency of plaintiffs' pleading by raising questions of law. (Code Civ. Proc., § 589, subd. (a); see 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 894, p. 333.) Solely for that purpose, we treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]; *Daar* v. *Yellow Cab Co.* (1967) 67 Cal.2d 695, 713 [63 Cal.Rptr. 724, 433 P.2d 732].) We also consider matters which may be judicially noticed. (Code Civ. Proc., § 430.30, subd. (a); *Dryden* v. *Tri-Valley Growers* (1977) 65 Cal.App.3d 990, 997 [135 Cal.Rptr. 720].) "The trial court's ruling will be reversed if, based on the complaint, *any* legal theory can be stated against the defendant or if the defect can be reasonably cured by an amendment. [Citation.]" (*Denham* v. *Farmers Ins. Co.* (1989) 213 Cal.App.3d 1061, 1064 [262 Cal.Rptr. 146], original italics.)

With these rules in mind, we accept as true the allegations of the second amended complaint (complaint), which alleges in pertinent part the follow-ing. At the time of the crash, defendants owned, maintained, and controlled

---

picked up by the receivers in aircraft which enable the pilot to calculate a safe approach to the runway.

[2] Plaintiffs' action, filed in the federal court, was dismissed as to the United States and cer-tain other defendants.

[3] All further statutory references are to title 49 of the United States Code unless otherwise indicated.

the Airport. The Airport created a dangerous condition by its instrument approach landing system, in that distance measuring equipment is located on a mountain approximately five miles south of the Airport as well as at the Airport, requiring pilots using an instrument approach landing to switch from one frequency to the other; the need to change frequencies creates confusion for pilots; and because of the confusing instrument approach landing system, the Airport should have had but failed to have a control tower or personnel located at the Airport to communicate with aircraft attempting to make an instrument approach landing, or a middle marker or directional beam located on the runway to signify to incoming aircraft that the aircraft has passed over the airport or runway. Defendants created the dangerous condition by negligently designing, constructing, and maintaining public property known as the Ukiah Airport, but failed to take any action to correct it. The dangerous condition proximately caused the crash of the aircraft in wooded mountainous terrain south of the Airport during an attempt to land at the Airport.

Defendant City demurred on the grounds that the complaint failed to state any cause of action and was uncertain. (Code Civ. Proc., § 430.10, subds. (e) and (f).) As to the first ground, the City contended, among other things, that the Act granted the Department of Transportation, including the Federal Aviation Administration (FAA), exclusive authority to establish, improve, operate, and maintain air navigation facilities such as those at the Airport; that the City had no control over the air navigation facilities at the Airport, which precluded the City from operating or improving them; and that the causes of action alleged therefore were preempted by the Act.[4]

 Attached to the moving papers in support of the demurrer was a copy of portions of the official National Transportation Safety Board (NTSB) report on the crash.[5] The report states that the Airport is not

---

[4] A complaint may be read as including matters judicially noticed, and thereby made subject to attack on demurrer on the basis of such matters. (Code Civ. Proc., § 430.30, subd. (a); 5 Witkin, Cal. Procedure, Pleading, *supra*, § 896, p. 337.) In the City's reply brief to plaintiffs' opposition to the demurrer, the City explained that it owns the land on which the Airport is constructed, but that the FAA operates the local flight service station at the Airport, and the FAA employs navigation maintenance engineers and others to operate and maintain the navigation facilities. Plaintiffs state in their opposition papers that the City granted the federal government easements for the purpose of construction and operation of navigation facilities at the Airport. We take judicial notice of these facts, which neither party disputes. (Evid. Code, § 452, subd. (h).)

[5] We take judicial notice of the NTSB report pursuant to Evidence Code section 452, subdivision (h). Although section 1441(e) prohibits the admission into evidence of the NTSB's opinions or conclusions in such report as to possible causes of an accident or negligence, the admission of factual material or a statement of the factual circumstances surrounding or leading to the accident in such report is permissible. (See *Murphy* v. *Colorado Aviation, Inc.* (1978) 41 Colo.App. 237 [588 P.2d 877, 881-882].)

certificated by the FAA, but that a Ukiah flight service station staffed by FAA personnel operates navigation facilities at the Airport. The report indicates that the instrument landing system at the Airport consists of a "localizer" radio frequency, and that other navigation aids utilized are high frequency navigation facilities and distance measuring equipment. The report contains statements of the FAA air traffic control specialists working at the Ukiah flight service station at the time of the crash. The FAA personnel reported radio contact from Bethman's aircraft south of the very high frequency omnirange (VOR) station[6] and also received an "IFR inbound notification" of the aircraft from the Oakland Center shortly before losing contact with the aircraft. The report states that the type of instrument landing for which Bethman was cleared was a nonprecision or "localizer only" approach. It further states that when the aircraft's navigation receivers were removed and examined, it was determined that the number 1 navigation receiver was set on the Ukiah localizer frequency, while the number 2 navigation receiver was set on the Ukiah VOR frequency. The distance measuring equipment was set to select the number 2 navigation receiver.

Evidently, Bethman failed to switch his distance measuring equipment from the number 2 navigation receiver (set on the VOR frequency) to the number 1 navigation receiver (set on the Ukiah localizer frequency) as he approached the Airport, resulting in the confusion as to his aircraft's location, as alleged in the complaint.

As to the Airport's navigation facilities, the report noted no deficiencies in such facilities: *"AIDS TO NAVIGATION* [¶] . . . A flight inspection of the Ukiah, California, LOC/DME Runway 15 approach and associated facilities was conducted on May 1, 1984, at approximately 1630 by the FAA. The facility operation was found to be satisfactory and no discrepancies were noted."

The trial court sustained the demurrer without leave to amend on the ground that the entire field of aircraft navigation systems has been preempted by the federal government, and therefore the complaint failed to state a cause of action.

### III. *Overview*

Plaintiffs' claim that the City is liable for a dangerous condition created by inadequate airport navigation facilities is based upon an erroneous

---

[6] 14 Code of Federal Regulations, section 1.1 (1989).

premise concerning the City's authority to design, install, regulate, or control the Airport's navigation facilities.

The operation of public airports involves the interplay of federal, state, and local municipal regulation and control.[7] (See Rhyne, Airports and the Law, Nat. Inst. of Mun. Law Officers Research Report No. 162 (1979) pp. 1-3 (hereafter Airports and the Law); see also *United Air Lines, Inc.* v. *Occupational Safety & Health Appeals Bd.* (1982) 32 Cal.3d 762 [187 Cal.Rptr. 387, 654 P.2d 157].) Pursuant to the powers conferred by the Government Code, a municipality such as the City has the authority to acquire property for use as an airport and to erect and maintain hangars, flying fields, and places for takeoffs, landings, and storage of aircraft, in addition to air navigation facilities. (Gov. Code, § 50470; *Stagg* v. *Municipal Court* (1969) 2 Cal.App.3d 318, 322-323 [82 Cal.Rptr. 578].) Government Code section 50474 specifies a municipality's powers with respect to the operation and maintenance of a public airport, which include the exaction of fees and tolls for their payment, the regulation of the embarkation or debarkation of passengers or property to and from landing places, the lease of space, the regulation of airport facilities and means of transportation within the airport, and the cooperation with the federal government. (Gov. Code, § 50474, subds. (a)-(i).)

■ Courts have held that a municipality such as the City acts in a proprietary capacity in owning and operating an airport. (See *Greater Westchester Homeowners Assn.* v. *City of Los Angeles* (1979) 26 Cal.3d 86, 96-97 [160 Cal.Rptr. 733, 603 P.2d 1329]; *Air Transport Association of America* v. *Crotti* (N.D.Cal. 1975) 389 F.Supp. 58, 62-64.) For example, in *Greater Westchester,* our Supreme Court stated that the city, as an airport proprietor, retained responsibility for land use planning designed to minimize the effects of noise, and held the city liable for injuries resulting from airport noise constituting a nuisance. (*Greater Westchester, supra*, at p. 98; see also *Gray* v. *America West Airlines, Inc.* (1989) 209 Cal.App.3d 76, 85-86 [256 Cal.Rptr. 877] [complaint sought damages against airport owner based on premises liability for a dangerous condition of property arising from plaintiff's injury when she tripped over an unattended box on the concourse area of an airport].)

---

[7] The California State Aeronautics Act (SAA) (Pub. Util. Code, § 21001 et seq.) embodies state law governing aviation, enacted for the stated purpose of, inter alia, effecting uniformity of aeronautics laws and regulations consistent with federal laws and regulations, and providing for cooperation with federal authorities in the development of a state-wide system of airports and a national system of aviation. (Pub. Util. Code, § 21002.) The SAA explicitly recognizes, however, the preemptive effect of federal aviation law, with the exception of economic regulations: "This state recognizes the authority of the federal government to regulate the operation of aircraft and to control the use of the airways, and nothing in this act shall be construed to give the department the power to so regulate and control safety factors in the operation of aircraft or to control use of the airways. . . ." (Pub. Util. Code, § 21240.)

A city, however, in its capacity as airport proprietor, may not regulate those aspects of airport operation or aircraft navigation which are preempted by the Act. (*City of Burbank* v. *Lockheed Air Terminal* (1973) 411 U.S. 624, 625-626 [36 L.Ed.2d 547, 93 S.Ct. 1854]; see Airports and the Law, *supra*, at pp. 5-7.)[8] We therefore examine the role of the federal government under the Act in the establishment and operation of airport navigation facilities.

## IV. *The Act and Pertinent Federal Regulations*

The Act constitutes a comprehensive scheme of federal control of civil aviation within the jurisdiction of the United States, conferring on the Secretary of Transportation (Secretary)[9] extensive authority to regulate the use of the nation's navigable airspace. (See §§ 1302, 1346, 1348-1355, 1421; *In re Mexico City Aircrash of October 31, 1979* (9th Cir. 1983) 708 F.2d 400, 404.) Such authority, exercised principally by the FAA, extends to regulation of air navigation facilities (§§ 1348, 1353); air traffic rules and regulations (§ 1348(c)); and rates, routes, and services of air carriers (§§ 1302(a), 1371-1374).

A. *Section 1348.* Section 1348 defines the powers and duties of the Secretary regarding airspace control and navigation facilities. Section 1348(a) directs the Secretary to formulate plans and policies governing the use of navigable airspace and to establish such terms, conditions, and limitations as are necessary to insure the safety of aircraft and the efficient utilization of such airspace.

Sections 1348(b) and (c) vest the Secretary with the authority to control air navigation facilities and establish air traffic rules which are pertinent to the attempted instrument landing alleged in the instant case. Section 1348(b) provides in part: "The Secretary of Transportation is authorized, within the limits of available appropriations made by Congress, (1) to acquire, establish, and improve air-navigation facilities wherever necessary; (2) to operate and maintain such air-navigation facilities; (3) to arrange for

---

[8] "Cities may exercise their police power to regulate local airport operation and some aspects of aircraft operations. Aviation rules and regulations designed to protect the public safety, health and welfare have been upheld as valid exercises of the municipal police power. However, local regulations must be reasonable and must not conflict with existing state or federal regulations. Furthermore, cities may not regulate those aspects of aircraft operation which have been preempted by the federal government nor may such regulations unduly burden interstate commerce." (Airports and the Law, *supra*, at pp. 5-6, fns. omitted.)

[9] All functions, powers, and duties of the former Federal Aviation Agency and the administrator thereof were transferred to the Secretary, pursuant to Public Law No. 89-670 (Oct. 15, 1966) 80 Statutes at Large 931, with the establishment of the FAA within the Department of Transportation. (§ 1655(c)(1).)

publication of aeronautical maps and charts necessary for the safe and efficient movement of aircraft in air navigation utilizing the facilities and assistance of existing agencies of the Government so far as practicable; and (4) to provide necessary facilities and personnel for the regulation and protection of air traffic. . . ." Section 1348(c) further authorizes the Secretary to prescribe air traffic rules and regulations governing the flight of aircraft, including rules for the prevention of collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects.

B. *14 Code of Federal Regulations.* Section 1348 confers extensive power upon the Secretary to prescribe standards and regulations concerning numerous aspects of aviation navigation, including the installation of air control towers, radio navigation systems, and other navigation aids. (See § 1348 and annot. foll. 49 U.S.C.A. § 1348 (1989 pocket pt.) pp. 33-38.) Pursuant to this authority, the Secretary has promulgated comprehensive rules and guidelines, published in 14 Code of Federal Regulations, section 1.1 et seq. (1989) (FAA regulations), governing air navigation and IFR approach landings. (See *Stork* v. *United States* (S.D.Cal. 1967) 278 F.Supp. 869, 875.) Pertinent parts of FAA regulations which apply to the attempted IFR approach landing alleged here are found in 14 Code of Federal Regulations, sections 91.1 et seq., 97.1 et seq., and 171.1 et seq.[10] Section 91.115 et seq. of 14 Code of Federal Regulations contains instrument flight rules, and section 91.116 sets forth requirements for takeoffs and landings under IFR. Section 97.1 et seq. governs standard instrument approach procedures for aircraft landings under IFR, incorporating sections of the Federal Register and criteria contained in the United States Standard for Terminal Instrument Approach Procedures.

Section 171.1 et seq. of 14 Code of Federal Regulations sets forth a maze of regulations governing the approval and operation of airport facilities applying instrument flight rules and air traffic control procedures related to those facilities, including VOR facilities, instrument landing system facilities, and distance measuring equipment. They establish the requirements which must be met before the FAA will approve such facilities, including installation requirements, maintenance and operation requirements, and the requirement of periodic filing of reports with the FAA.

■ The FAA regulations have the force and effect of law binding upon pilots, FAA personnel, and the operators of airports (see *Ross* v. *United*

---

[10] In addition, 14 Code of Federal Regulations, section 139.1 et seq., contains extensive regulations governing FAA certification and operation of airports which serve air carriers having a seating capacity of 30 or more. Such regulations include requirements for the marking and lighting systems, runway and taxi identification, and maintenance of traffic and wind direction indicators.

The NTSB report indicated that the Airport has no FAA certification.

*States* (5th Cir. 1981) 640 F.2d 511, 517-518), and are subject to only limited review in the federal courts (*In re Braniff Airways, Inc.* (5th Cir. 1983) 700 F.2d 935, 941). Federal courts have applied the standards, duties, and requirements established by the regulations in determining questions of liability under the Federal Tort Claims Act in actions arising from airplane crashes. For example, in *Ross*, an airplane crashed after colliding with electric power lines on a landing field while the pilot was attempting an IFR approach landing. The pilot's heirs brought an action against the United States, claiming negligence on the part of an FAA air traffic controller.

The parties agreed at trial that the height of the power lines was in accordance with FAA regulations on obstacle clearance. The plaintiffs nevertheless contended that the government failed to provide a sufficient buffer zone of obstacle clearance at the landing field, relying on FAA manual criteria recommending a greater clearance than the FAA regulations. (*Ross v. United States, supra*, 640 F.2d at p. 517.) The court rejected this contention, stating that the FAA regulations, unlike the advisory criteria, had the force of law in determining negligence, and found no negligence as a matter of law on the part of the government in the maintenance of the power lines. (*Id.*, at p. 518.) The court also held that the pilot's flying below certain altitude levels in making the IFR approach in contravention of FAA regulations, while necessarily aware of the necessity for maintaining prescribed approach altitudes, established his contributory negligence. (*Id.*, at p. 520.) (The court ultimately found negligence on the part of the FAA air controller on another ground.) (*Id.*, at pp. 518-519; see *Redhead v. United States, supra*, 686 F.2d at pp. 180-181.)

Further, at least one federal court has found that it could not interfere with the FAA's exercise of its discretionary authority in formulating rules and procedures for safety of aircraft takeoffs and landings. (*West v. F.A.A.* (9th Cir. 1987) 830 F.2d 1044, 1048-1049.) In *West*, FAA employees designed and approved a special instrument approach and departure procedure for an airport lying in a deep valley surrounded by mountains. An aircraft following the FAA departure procedure struck the slope of a mountain while attempting to depart from the airport. In an action against the government for FAA negligence, the district court found that the probable cause of the accident was insufficient ground lighting, and concluded the FAA employees had negligently failed to conduct night flight tests to determine whether there was a problem with lighting.

On the second appeal, the Ninth Circuit held that the FAA exercised a discretionary function in designing and approving a departure procedure, and that its actions were therefore immune from liability under the

discretionary function exception of the Federal Tort Claims Act. (*West* v. *F.A.A., supra*, 830 F.2d at pp. 1048-1049.)

### V. *Federal Preemption of Plaintiffs' Action*

A. *Federal preemption generally.* Sections 1305 and 1506 constitute the Act's sole explicit statements concerning preemption. Section 1305(a)(1) provides: "Except as provided in paragraph (2) of this subsection, no State or political subdivision thereof and no interstate agency or other political agency of two or more States shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier having authority under subchapter IV of this chapter to provide air transportation."

Section 1305(b)(1) provides: "Nothing in subsection (a) of this section shall be construed to limit the authority of any State or political subdivision thereof or any interstate agency or other political agency of two or more States as the owner or operator of an airport served by any air carrier certificated by the Board to exercise its proprietary powers and rights."

Section 1506 declares that its provisions are not intended to abridge remedies that were existing at common law or by statute, but that they are in addition to such remedies.[11]

These statutory provisions codify in large part existing case law on preemption. "Under the doctrine of preemption, federal law prevails over state law if Congress has expressed an intent to occupy a given field in which federal law is supreme. But even if there is no such intent, state law is preempted if it conflicts with federal law so that it is impossible to comply with both, or if the state regulations stand as an obstacle to the accomplishment of the full purposes that Congress sought to achieve. [Citation.]" (*Elsworth* v. *Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 548 [208 Cal.Rptr. 874, 691 P.2d 630], citing *Pacific Gas & Elec.* v. *Energy Resources Comm'n* (1983) 461 U.S. 190, 203-205 [75 L.Ed.2d 752, 765, 103 S.Ct. 1713].)

In *City of Burbank* v. *Lockheed Air Terminal, supra*, 411 U.S. 624, Burbank enacted an ordinance placing a limited curfew on jet flights from the Hollywood-Burbank Airport for noise abatement purposes. The appellees sought an injunction against the enforcement of the ordinance. On appeal from the Ninth Circuit's upholding the injunction on federal preemption grounds, the Supreme Court affirmed, holding the ordinance

---

[11] The Act itself does not provide any private right of action. (*In re Mexico City Aircrash of October 31, 1979, supra*, 708 F.2d at p. 408.)

was preempted by the Act. The court reviewed the district court's findings that such curfews would increase congestion and cause a loss of efficiency in the use of navigable airspace, and that the FAA has consistently opposed curfews unless managed by it. (*Id.*, at p. 628 [36 L.Ed.2d at pp. 550-551].) The court further noted that the 1972 amendment of the Act created a comprehensive scheme of federal control of the aircraft noise control problem. The court concluded: "It is the pervasive nature of the scheme of federal regulation of aircraft noise that leads us to conclude that there is pre-emption." (*Id.*, at p. 633 [36 L.Ed.2d at p. 554].) The court further noted that "the Administrator has imposed a variety of regulations relating to takeoff and landing procedures and runway preferences. The Federal Aviation Act requires a delicate balance between safety and efficiency, 49 U.S.C. § 1348(a), and the protection of persons on the ground. 49 U.S.C. § 1348(c). . . . The interdependence of these factors requires a uniform and exclusive system of federal regulation if the congressional objectives underlying the Federal Aviation Act are to be fulfilled." (*Burbank, supra*, at pp. 638-639 [36 L.Ed.2d at pp. 556-557].)

Since *Burbank*, judicial decisions addressing the issue of preemption have distinguished between state or municipal action which effectively regulates the use of navigable airspace, aircraft traffic, or air flight safety, on the one hand, and state or municipal regulation of the location and environmental impacts of airports, the safety of ground maintenance facilities, and the manufacture of aircraft, on the other hand. As to the former, courts have invalidated such action on the ground of federal preemption. (See, e.g., *San Diego Unified Port Dist.* v. *Superior Court* (1977) 67 Cal.App.3d 361, 376 [136 Cal.Rptr. 557]; *United States* v. *City of New Haven* (2d Cir. 1974) 496 F.2d 452, 454.)

As to the latter, courts have found no exclusive control by the FAA under the Act and thus no preemption. (See *Elsworth* v. *Beech Aircraft Corp., supra*, 37 Cal.3d at pp. 549-550; *Greater Westchester Homeowners Assn.* v. *City of Los Angeles, supra*, 26 Cal.3d at p. 96; *United Air Lines, Inc.* v. *Occupational Safety & Health Appeals Bd., supra*, 32 Cal.3d at pp. 768, 773-775; *Air Transport Association of America* v. *Crotti, supra*, 389 F.Supp. at pp. 64-65 [California noise abatement provisions "which in no wise intrude upon or affect flight operations and air space management in commerce . . ." not preempted].)[12]

---

[12] One commentator notes the distinction made by the courts between the regulation of air navigation and flight safety, and regulation of environmental concerns: "Significant local authority over air safety ended with the passage of the 1958 Act. . . . [¶] The courts have generally construed the Federal Aviation Act of 1958 as allowing only federal regulation of safety in air navigation. . . . [¶] *It is apparent that, in the field of safety control, Congress and the courts have excluded the states from any appreciable regulatory role, i.e., the area has been*

For example, in *United Air Lines, Inc.* v. *Occupational Safety & Health Appeals Bd., supra*, 32 Cal.3d 762, the issue was whether under a California Labor Code provision, a state agency had jurisdiction to issue a citation for an unsafe working condition at an airport ground maintenance facility, or whether the FAA had exclusive jurisdiction to do so. The court found the Act did not preempt the agency's jurisdiction, concluding that while the Act contemplated some FAA regulation of ground employee practices, and the FAA had the authority to issue regulations relating to the health and safety of ground maintenance personnel, the FAA was primarily concerned with safety in flight, and in fact the FAA expressly disclaimed broad authority to regulate all aspects of the occupational safety of airline maintenance personnel. (*Id.*, at pp. 769-770, 773-774.)

In *Elsworth* v. *Beech Aircraft Corp., supra*, 37 Cal.3d 540, the court held that a products liability action against an aircraft manufacturer for defective design was not federally preempted even though the aircraft had been certified by the FAA as complying with safety regulations. The court stated that, given the real possibility of error in certification, allowing the jury to determine whether the manufacturer did in fact comply with the FAA safety regulations did not interfere with the accomplishment of any federal objectives. (*Id.*, at pp. 550-551.) The court further indicated in dicta that because the issuance of a FAA-type certificate certified nothing more than compliance with FAA minimum safety requirements for aircraft, compliance was insufficient to absolve the defendant's duty as a manufacturer. (*Id.*, at p. 547, citing *Wilson* v. *Piper Aircraft Corp.* (1978) 282 Ore. 61 [577 P.2d 1322, 97 A.L.R.3d 606].)

B. *Preemption of plaintiffs' claims.* ■ By the complaint, plaintiffs essentially claim that the City had a duty to determine whether the Airport's navigation facilities or lack thereof created a dangerous condition of property under California law and to take steps to remedy the condition, regardless of the Airport's compliance with applicable FAA regulations.[13]

_____

*preempted*. . . . [¶] [However, due to the] increase in the adverse environmental factors, particularly noise, created around airports . . . , [¶] . . . [t]he exercise of [their] police powers is a strong interest of the states and federal legislation will not be deemed to have precluded their use unless there is a clear congressional intent to do so pursuant to a legitimate congressional concern." (Comment (1973) 39 J. of Air Law and Commerce 521, 533-534, italics added, fn. omitted.)

[13] Significantly, *plaintiffs do not allege that the Airport's navigation facilities failed to satisfy or violated any pertinent FAA regulations or requirements.* As stated *ante*, the NTSB report noted the Airport's navigation facilities were satisfactory. We therefore do not determine here the question whether plaintiffs in future cases could state a cause of action against the City for negligence under California law based upon the City's violation of FAA regulations and requirements, or any corresponding SAA regulations or requirements, in maintaining the Airport.

We conclude, as did the trial court, that such claim is inconsistent with the Act. Sections 1348(b) and (c) vest with the Secretary extensive authority to regulate and control the Airport's navigation facilities, and the corresponding FAA regulations provide the specific and detailed rules and requirements which implement such authority. Because such authority pertains directly to the use of navigable airspace and air flight safety, it lies exclusively with the Secretary and the FAA. The determination of the need for additional navigation aids at the Airport, e.g., air control towers, runway markers, or directional beams, as alleged in the complaint, falls squarely within such exclusive authority. Accordingly, the City had neither any degree of control over nor any authority to implement changes in the navigation facilities, which fact directly undercuts the premise of plaintiffs' claim against the City.

Stated another way, plaintiffs essentially request this court to hold that navigation facilities which were adequate under FAA standards were inadequate and to impose upon municipalities the duty to establish additional standards and requirements. Such a holding would be inconsistent with the FAA's exclusive authority to make these determinations. (See *West* v. *F.A.A., supra*, 830 F.2d at pp. 1048-1049.) As stated in *City of Burbank* v. *Lockheed Air Terminal, supra*, 411 U.S. at pages 638-639 [36 L.Ed.2d at pages 556-557], the FAA has imposed a variety of regulations relating to takeoff and landing procedures which implement a "uniform and exclusive system" with a "delicate balance between safety and efficiency . . . ." A ruling of this court that additional procedures and facilities were necessary, and that the City had an obligation to implement them, would interfere with that uniform system, and thus stand as an obstacle to the accomplishment of the purpose of the Act.

The issues and circumstances here are unlike those before the court in *United Air Lines, Inc.* v. *Occupational Safety & Health Appeals Bd., supra*, 32 Cal.3d 762, or *Elsworth* v. *Beech Aircraft Corp., supra*, 37 Cal.3d 540. Unlike the case in *United Air Lines,* the navigation facilities which are the subject of the complaint here regulate and pertain to flight safety, which the *United Air Lines* court recognized as one of the primary purposes of the Act. (*United Air Lines, supra*, at p. 770.)

In *Elsworth,* the aircraft manufacturer, not the FAA, manufactured the aircraft and was in control of the safety of its design. The FAA solely issued a type certificate specifying whether the aircraft met certain safety regulations. (*Elsworth* v. *Beech Aircraft Corp., supra*, 37 Cal.3d at pp. 547-548.) Here, the FAA, not the City, had ultimate control over the installation and operation of the Airport's navigation facilities and the authority to determine the safety requirements for those facilities.

Thus, although the Act, by virtue of section 1506 (cited *ante*), does not preclude state tort law remedies for injuries arising from a field completely occupied by the FAA (*Elsworth* v. *Beech Aircraft Corp., supra,* 37 Cal.3d at p. 549; see, e.g., *People* v. *Valenti* (1984) 153 Cal.App.3d Supp. 35, 40 [200 Cal.Rptr. 862]), the maintenance of the instant action would frustrate the objectives of federal law. Plaintiffs' claims against the City are therefore preempted by the Act. (See *Elsworth, supra,* at p. 549.)

## VI. *Disposition*

The judgment is affirmed.

White, P. J., and Merrill, J., concurred.