## Malik v. Lehigh Balloon Festival

*Catherine B. Slavin,* for plaintiff Carlene Malik.
*Clifford E. Haines,* for plaintiff Betty June Miller.
*Patrick J. O'Connor,* for defendant Queen City Aviation, Inc.

WALLITSCH, *J.,* December 16, 1993—

### I. INTRODUCTION

Before the court is the motion for summary judgment of defendant Queen City Aviation, Inc. It has been alleged in this case that QCA breached several duties, including the duty to close the airport and the duty to not create any unsafe conditions for people using the airport facility. It is alleged that these breaches caused or contributed to a collision between two airplanes, causing the death of seven people. QCA moves for summary judgment claiming that the claims against it are pre-empted by the Federal Aviation Act of 1958, 49 U.S.C. §1301 et seq.

Summary judgment "shall be rendered" if the court determines that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Pa.R.Civ.P. 1035(b); *Allen v. Merriweather,* 413 Pa. Super. 410, 411, 605

A.2d 424, 425 (1992); *Baesel v. New Blvd. Baking Co., Inc.,* 410 Pa. Super. 591, 593, 600 A.2d 610, 612 (1991). The moving party has the burden of showing that there is no genuine issue of material fact. *Allen, supra* at 411, 605 A.2d at 425; *Baesel, supra* at 594, 600 A.2d at 612; *Hower v. Whitmak Associates,* 371 Pa. Super. 443, 445, 538 A.2d 524, 525 (1988). In response, the nonmoving party may not rest upon the pleadings, but must set forth specific facts demonstrating a genuine issue for trial. *Phaff v. Gerner,* 451 Pa. 146, 149, 303 A.2d 826, 829 (1973). In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party, and any doubts are to be resolved against entry of summary judgment. *Allen, supra* at 411, 605 A.2d at 425; *Baesel, supra* at 594, 600 A.2d at 612.

The decision as to whether a state cause of action is pre-empted by federal law is a question of law to be decided by the court. If we find that pre-emption applies to this case, QCA would then be entitled to judgment as a matter of law. We must therefore determine whether the claim against it is pre-empted by federal law. In pursuing this task, we will first examine the relevant facts and allegations and then proceed to examine and apply pre-emption analysis to those facts and allegations.

## II. FACTS OF THE CASE

Queen City Municipal Airport is owned by the City of Allentown and leased to the defendant Queen City Aviation, Inc. The airport is an "uncontrolled" airport. This means that it has no control tower but rather a system called UNICOM by which pilots communicate with each other. The airport also communicates with pilots via the UNICOM system.

On July 28, 29 and 30, 1989, the Sixth Annual Lehigh Valley Balloon Festival was held at this airport. For purposes of this festival, QCA rented to Lehigh Valley Balloon Festival, Inc. "that part of the airport not used by *Queen City Aviation, Inc.* to carry on general aviation activities and sightseeing airplane rides." (Agreement between QCA and LVBF, response of plaintiffs to motion for summary judgment, exhibit F.) QCA specifically reserved the right to continue sightseeing and general aviation activities. *Id.*

The festival included parachute jumping, a hot air balloon race, and additional entertainment. Because of a federal regulation prohibiting parachute jumps over congested areas, 14 C.F.R. §105.15, the Maryland Army National Guard Parachute Demonstration Team required the LVBF to secure a waiver from the Federal Aviation Agency. Although the Maryland team was scheduled to jump at the festival, and although the LVBF secured a waiver for that purpose, the Maryland team did not end up performing at the festival. The waiver was granted specifically for jumps by the Maryland team. (Deposition of Brad Leidich, at 21-23.) The Lehigh Valley Parachute Club did jump at the festival, but no waiver was secured for these jumps. LVBF maintained that they did not believe that such a waiver was necessary, and that the only reason that they secured a waiver for the Maryland team was that the Maryland team requested it. *Id.* LVBF did secure a waiver from the FAA for the balloon race. (QCA's motion for summary judgment, exhibit H.) Additionally, FAA officials were present during the parachute jumping. (Deposition of Bob Sparks, at 98-99.)

A NOTAM is a notice to pilots concerning conditions at an aeronautical facility, changes in services or procedures, or hazards which pilots may not have known

of prior to taking off. A pilot may receive a NOTAM by contacting the nearest flight service station. A NOTAM was issued for the weekend of the balloon festival, warning all pilots who would contact a flight service station that ballooning and parachute demonstrations were being held at Queen City Airport. (Deposition of Brad Leidich, at 121.) QCA could have issued a NOTAM of the closing of the airport during the parachute jumping activity, but they did not do this. (Deposition of Joseph Wildman, at 75.) There is conflicting evidence as to whether QCA had authority to actually close the airport.

Also in preparation for the weekend's events, QCA shut down its flight school. (Deposition of Joseph Wildman, at 123-24, 148.) Further, they used the UNICOM system to broadcast when the parachutists had jumped. (*Id.* at 54, 126-27.) This was part of a method of communication established between QCA and the pilot of the jump plane, Mr. Peter Miller. (*Id.*)

Dr. Abdul Kahn and Dr. Mohammed A. Malik, had recently purchased a Beechcraft A-36 aircraft, N2063V. They decided to check out their new aircraft on Sunday, July 30, 1993. With them on this day was Raymond Malik, Dr. Malik's son, Stephen Remo, a Continental Airlines pilot with many hours of experience in Beechcraft Bonanza A-36 type aircraft, Mr. Remo's wife, Kathleen, and their daughter, Alicia. The Beechcraft, with the above-listed passengers, took off from Queen City Airport sometime prior to 1:30 p.m. on that day.

At approximately 1:30 p.m. on Sunday, July 30, 1993, parachutists from the Lehigh Valley Parachute Club jumped from a plane piloted by Mr. Miller. The jump plane was a Cessna 182P aircraft, N2639G. After the parachutists had jumped, Mr. Miller travelled south of the airport per the instructions of QCA and then began

a descent. At this point, the two airplanes collided, killing all seven persons aboard both planes.

Numerous lawsuits were later instituted and consolidated for discovery, pretrial, and trial purposes. QCA filed a motion for summary judgment on June 7, 1993 claiming that all claims against it are pre-empted by the Federal Aviation Act of 1958, 49 U.S.C. §1301 et seq., and corresponding regulations. This motion is now before the court.

## III. PRE-EMPTION ANALYSIS, GENERALLY

The doctrine of pre-emption is founded on the Supremacy Clause of the U.S. Constitution. That clause provides:

"This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding." U.S. Const., Art. VI, cl. 2.

Where a state and the federal government issue conflicting laws, the Supremacy Clause requires invalidation of the law of the state government. The key to pre-emption analysis is ascertaining congressional intent. *Wisconsin Public Intervenor v. Mortier,* 111 S.Ct. 2476, 2481 (1991); *Ingersoll-Rand Co. v. McClendon,* 111 S.Ct. 478, 482 (1990). If Congress, by passing a federal law, intended to pre-empt a certain type or category of state regulation, then that regulation is pre-empted.

It is, however, not always easy to ascertain the intent of Congress. The problem is that Congress' expression

of intent is often far from clear, primarily because Congress cannot predict what laws states may eventually pass. The U.S. Supreme Court has therefore developed a series of tests by which courts can determine congressional intent. The court has divided pre-emption analysis into three categories: express pre-emption, implied pre-emption, and pre-emption by conflict. First, Congress may expressly pre-empt entire categories of state laws by so stating in a statute. *Mortier, supra* at 2481. When it is unclear whether an express pre-emption provision applies to a particular state law, courts will often use legislative history to determine Congress' intent. *Id.* at 2483-84; *California Federal Savings & Loan Ass'n v. Guerra,* 107 S.Ct. 683, 692-94 (1987).

Second, courts are directed to look for implied pre-emption. Where Congress has not explicitly addressed pre-emption, pre-emption may be inferred when: (1) the goals of the federal statute reveal a purpose of precluding state regulation; (2) the federal regulation is so pervasive that it "occupies the field" and leaves no room for states to supplement it; or (3) the federal provision touches a field where federal interests are so dominant that they preclude state regulation. *Mortier, supra* at 2481-82; *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152 (1947).

Third, pre-emption by conflict may occur. Pre-emption occurs insofar as a state law actually conflicts with the federal law. *Mortier, supra* at 2482; *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Development Comm'n,* 461 U.S. 190, 203-04 (1983). The conflict must be significant. A conflict exists if compliance with both laws is impossible or if the state law frustrates the objectives of the federal law. *Boyle v. United Technologies Corp.,* 487 U.S. 500, 507-08 (1988). In determining whether a state law is pre-empted

through implied pre-emption or pre-emption by conflict, the courts are to "start with the assumption that the historic police powers of the states were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp., supra* at 230, 67 S.Ct. at 1152. See also, *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2129. (1981). Pre-emption under any one of these three methods of analysis is sufficient to invalidate the state law or regulation. Therefore, if we find pre-emption under one of these tests, our analysis ends. Furthermore, when a federal law includes an express pre-emption provision, the doctrines of implied pre-emption and pre-emption by conflict are inapplicable. *Cipollone v. Liggett Group, Inc.,* 112 S.Ct. 2608, 2618 (1992). With these standards in mind, we will begin by determining whether the claims against QCA have been expressly pre-empted.

## IV. EXPRESS PRE-EMPTION

The Federal Aviation Act of 1958, 72 Stat. 731, as amended, 49 U.S.C. §1301 et seq., has an express pre-emption provision. 49 U.S.C. §1305(a), entitled "Pre-emption," provides that "no state ... shall enact or enforce any law, rule, regulation, standard or other provision having the force and effect of law *relating to rates, routes, or services of any air carrier....*" (emphasis added) This provision was not part of the original Act, but was added in 1978 as part of the Airline Deregulation Act. These amendments, however, did not alter the savings clause at 49 U.S.C. §1506: "Nothing contained in [this Act] shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."

Section 1305(a) pre-empts all state laws or regulations "relating to rates, routes, or services of any air carrier." The U.S. Supreme Court discussed this provision in *Morales v. Trans World Airlines, Inc.,* 112 S.Ct. 2031 (1992). That case involved the question of whether this section pre-empted the fare advertising provisions of the National Association of Attorneys General. *Id.* at 2041. In finding that pre-emption did exist, the court found that the ordinary meaning of the phrase "relating to" is a broad one. *Id.* at 2037. "Relating to" meant "having a connection with or reference to." *Id.* The court came to this conclusion by relying on cases interpreting the "relating to" language in the pre-emption provision of the Employee Retirement Income Security Act, 29 U.S.C. §1001 et seq. We will therefore also look to these cases for aid.

Section 514 (a) of ERISA, 29 U.S.C. §1144(a), states that the provisions of that Act "shall supersede any and all state laws insofar as they may now or hereafter *relate to* any employee benefit plan...." (emphasis added) In *Ingersoll-Rand Co. v. McClendon,* 111 S.Ct. 478 (1990), the Supreme Court determined that the phrase "relate to" was meant to be very broad. *Id.* at 482, 483. See also, *FMC Corp. v. Holliday,* 111 S.Ct. 403, 407-08 (1990). However, the court did note that the reach of this pre-emption provision had its limits.

The court cited two of its previous cases in which it had found that the "relate to" language of ERISA §514(a) did not pre-empt state law. *Ingersoll-Rand Co., supra* at 483. First, a state law that might burden the administration of an employee benefit plan, but not the plan itself, was not pre-empted. *Mackey v. Lanier Collection Agency & Service, Inc.,* 486 U.S. 825, 841, 108 S.Ct. 2182, 2191 (1988). A second case determined that a state law that did not require an employee benefit

plan was not pre-empted. *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 23, 107 S.Ct. 2211, 2223-24 (1987). In *Fort Halifax,* the state statute was not pre-empted because it did not relate to benefit *plans. Id.* (emphasis added) Therefore, despite the breadth of the language "relate to," pre-emption was far from automatic.

Likewise, the pre-emption provision in the Federal Aviation Act has its limits. Although the phrase "relating to" is to be construed broadly, the state regulation must "have a connection with or reference to" "rates, routes, or services of any air carrier." 49 U.S.C. §1305(a); *Morales v. Trans World Airlines, Inc., supra* at 2037.

In the case at bar, QCA is alleged to have failed to satisfy several duties, including the duty to close the airport, the duty to warn pilots of the existence of other planes, the duty to supervise activities at the balloon festival, and the duty to make safe conditions for those persons using the airport's facilities. These duties are allegedly imposed on QCA by state tort law. The question we must ask is whether these alleged duties relate to the "rates, routes or services of any air carrier."

The Federal Aviation Act defines "air carrier" as "any citizen of the United States who undertakes, whether directly or indirectly or by a lease or any other arrangement, to engage in air transportation ..." 49 U.S.C. §1301(3). "Air transportation" is defined as "interstate, overseas, or foreign air transportation or the transportation of mail by aircraft." *Id.* at section 1301(10). The language of these definitions indicates that airports, and those who own and operate airports, are not within the reach of this Act. Queen City Airport and QCA are not "air carriers."

In *United States v. City of Montgomery,* 201 F. Supp. 590 (M.D. Ala. 1962), a municipal airport was held to be an "air carrier" within the meaning of this Act. In that case, Eastern Airlines and Delta Airlines used the airport, and these two airlines were concededly "air carriers." *Id.* at 592. The court determined that since the airport acquiesced in the racially discriminatory policies of the airlines, it should be considered an "air carrier" as well. *Id.* at 593.

In the case at bar, there are no air carriers in whose activities the airport could acquiesce. The *Montgomery* case is further distinguishable because it dealt with section 1374 of the Act, rather than, as in the present case, section 1301. The whole basis of the *Montgomery* holding, however, was that the airport acquiesced in the discrimination. Because neither QCA nor the airport acquiesced in the activities of any air carrier, they may not be considered "air carriers" themselves.

The airport is not an air carrier. QCA is not an air carrier. The two planes that collided were not air carriers; they were not engaged in air transportation as defined by the Act. Because no air carriers were involved in this matter, QCA's alleged duties do not "relat[e] to the rates, routes or services of any air carrier."

Generally, duties of airports to warn pilots of other planes and to close the airport due to dangerous conditions may affect the services of many air carriers. However, the court finds that this is too tenuous a relationship to warrant pre-emption, despite the breadth of the "relating to" language. Furthermore, we are here dealing with the specific duties of QCA, not the duties of airports in general. In this case, there were no air carriers involved. Therefore, QCA's alleged duties do not relate to the services of air carriers.

QCA cites a case from the Court of Appeals of California to support its contention of pre-emption. *Bethman v. City of Ukiah,* 216 Cal.App.3d 1395, 265 Cal.Rptr. 539 (1989), affirmed a decision dismissing a claim for maintaining a dangerous condition on airport property. The court determined that this claim was pre-empted by the Federal Aviation Act. *Id.* at 1409; 265 Cal.Rptr. at 548. QCA urges us to adopt the reasoning of this case and hold that the Act pre-empts the claims against QCA as well.

The claim in *Bethman* was based on the inadequacy of the airport navigation facilities, which were regulated and controlled pursuant to the Federal Aviation Act. *Id.* at 1398; 265 Cal.Rptr. at 540. The court began its analysis by distinguishing such regulation from claims relating to the services of air carriers:

"The Act ... confer[s] on the secretary of transportation ... extensive authority to regulate the use of the nation's navigable airspace.... Such authority, exercised principally by the FAA, extends to regulation of air navigation facilities (sections 1348, 1353); air traffic rules and regulations (section 1348(c)); and rates, routes and services of air carriers (sections 1302(a), 1371-1374)." *Id.* at 1402; 265 Cal.Rptr. at 543. (citations and footnotes omitted)

The court then went on to analyze the claim under section 1348. This section authorizes the secretary of transportation "(1) to acquire, establish, and approve air-navigation facilities whenever necessary; (2) to operate and maintain such air-navigation facilities ..." 49 U.S.C. §1348(b). The court determined that the plaintiffs' claim was flatly inconsistent with this language. *Id.* at 1408; 265 Cal.Rptr. at 547. To allow a finding that the airport had an identical duty would contravene the authority of the secretary of transportation. *Id.*

The *Bethman* court dealt with a provision specifically addressing the duties allegedly violated. In contrast, the case at bar reveals no provision specifically addressing the duty to close an airport, to make conditions safe for those individuals using the airport's facilities, to warn pilots of other planes, or to supervise activities at a balloon festival. These duties have never been specifically delegated to the secretary of transportation. In *Bethman,* the duty to operate and maintain the air-navigation facilities was specifically delegated to the secretary of transportation by section 1348 of the Act. This duty is not alleged in the case at bar. Moreover, the *Bethman* court never addressed the issue of whether such a claim related to the services of an air carrier.

Therefore, *Bethman* is distinguishable from our case. We decline to extend the reasoning of the California court to encompass the duties alleged in this case. We are convinced that such duties are not exclusively governed by the FAA. We are further convinced that these duties do not relate to the services of an air carrier. Therefore, we find that the claims against QCA are not expressly pre-empted.

## V. *CIPOLLONE v. LIGGETT GROUP, INC.*

In 1992, the United States Supreme Court dealt with the express pre-emption provisions in the Public Health Cigarette Smoking Act of 1969, Pub.L. 91-222, 84 Stat. 87, as amended, 15 U.S.C. §§1331-1340, and its predecessor, the Federal Cigarette Labeling and Advertising Act of 1965, Pub.L. 89-92, 79 Stat. 282. In that case, the executor of a decedent's estate instituted actions for breach of express warranty, failure to warn, fraudulent misrepresentation and conspiracy to misrepresent and conceal material facts against a cigarette manufacturer after the decedent died of lung cancer. The

court found some of plaintiff's claims were pre-empted, and others were not. *Cipollone v. Liggett Group, Inc.,* 112 S.Ct. 2608, 2621-25 (1992).

This case is most important, however, for its announcement that when an express pre-emption provision is at issue, courts should not look beyond the provision and find implied pre-emption. In other words, courts should use the principles of implied pre-emption only when Congress has provided no express language concerning pre-emption. *Id.* at 2618. A court's analysis should stop if there is an express pre-emption provision and it is found that the claims at issue are outside the reach of that provision.

In the case at bar, there is an express pre-emption provision that does not reach the claims against QCA. Because we have found that this provision does not pre-empt these claims, *Cipollone* requires us to terminate our analysis. Congress provided us with an express provision, thereby implying that any claims not within this provision would not be pre-empted. Our analysis therefore ceases, and we need not discuss the doctrines of implied pre-emption and pre-emption by conflict.

## VI. CONCLUSION

For the above reasons, we find that the Federal Aviation Act of 1958, 49 U.S.C. §1301 et seq., does not pre-empt the claims in the case at bar. The motion for summary judgment of defendant Queen City Aviation, Inc. is therefore denied.

## ORDER

And now, December 16, 1993, upon consideration of the motion for summary judgment of defendant Queen City Aviation, Inc., the responses thereto, the written

briefs and oral arguments thereon, and for the reasons expressed in the accompanying opinion,

It is hereby ordered that the motion for summary judgment of defendant Queen City Aviation, Inc. is denied.