DALLAS/FORT WORTH INTERNA-
TIONAL AIRPORT BOARD, A Joint
Board of the City of Dallas, Texas, and
the City of Fort Worth, Texas; Ameri-
can Airlines, Inc.; Delta Air Lines, Inc.;
United Parcel Service Co.; The City of
Dallas, Texas; and The City of Fort
Worth, Texas, Appellants,

v.

The CITY OF IRVING, Texas; The City
of Euless, Texas; and The City of
Grapevine, Texas, Appellees.

No. 05–92–00559–CV.

Court of Appeals of Texas,
Dallas.

March 31, 1993.

Rehearing Denied May 19, 1993.

Eric W. Buether, Richard A. Lempert, Mike McKool, Jr., McKool Smith, P.C., Mike Joplin, David J. LaBree, P. Michael Jung, Strasburger & Price, L.L.P., Dallas, for appellants.

Christopher J. Caso, Robert H. Power, Power & Deatherage, Irving, Perry M. Rosen, Eliot R. Cutler, Cutler & Stanfield, Washington, DC, Bob McFarland, Paul F. Wieneskie, McFarland, Cribbs and Arlington, Clarence Guittard, Guittard, Hyden and Guittard, and Don Rorschach, Irving, for appellees.

Before BAKER, STEPHENS[1] and WHITHAM[2], JJ.

## OPINION

BAKER, Justice.

The Dallas/Fort Worth International Airport Board, a joint board of Dallas and Fort Worth, sued Irving, Euless, and Grapevine for requiring the Airport Board to follow the cities' local zoning ordinances. American Airlines, Delta Air Lines, and United Parcel Service Company intervened. Irving, Euless, and Grapevine joined Dallas and Fort Worth as third-party defendants. All parties moved for summary judgment. The plaintiffs and third-party defendants moved the trial court to find that the local ordinances of Irving, Grapevine, and Euless are preempted by federal and state law and that the Airport Board has the power of eminent domain over the defendant cities. The defendants, Irving, Grapevine, and Euless, moved the trial court to find that their local ordinances are not preempted and that the Airport Board has no power of eminent domain over them. The trial court granted summary judgment for Irving, Euless, and Grapevine. In seven points of error, the Airport Board, American, Delta, UPS, Dallas, and Fort Worth

---

1. The Honorable Bill J. Stephens, Justice, Retired, Court of Appeals, Fifth District of Texas at Dallas, sitting by assignment.

2. The Honorable Warren Whitham, Justice, Retired, Court of Appeals, Fifth District of Texas at Dallas, sitting by assignment.

contend the trial court erred in granting appellees' summary judgment in part and in denying Plaintiff's, Intervenors', and Third–Party Defendants' Joint Motion for Summary Judgment in part. The trial court severed the issues that are before us in this appeal. We affirm the trial court's judgment.

## BACKGROUND

### A. Facts

In 1965, Dallas and Fort Worth entered into a Contract and Agreement to construct an international airport to serve the metropolitan area of Dallas/Fort Worth. The Agreement contemplated the creation of a regional airport authority, a special purpose governmental entity separate from each of the cities, that would govern and operate the new airport. In 1966, the Texas Legislature amended the Texas Constitution to provide a mechanism for the creation of regional airport authorities. Following this amendment, the Texas Legislature enacted the North Central Texas Airport Authority. Dallas and Tarrant Counties held a referendum to decide whether to create the new regional airport authority. Dallas County voters rejected the referendum.

Dallas and Fort Worth agreed to construct and operate the proposed airport jointly as a municipal airport. The cities created the Dallas/Fort Worth International Airport Board. The Board has no separate governmental authority. Irving, Euless, and Grapevine agreed to the airport's location within their respective jurisdictions and helped in the planning and construction of the airport. None of the host cities has ever executed any agreement, ordinance, or resolution relinquishing control over any part of their cities to the Airport Board.

In 1971, the Airport Board issued its original Master Plan for the new airport. The Master Plan set up the land uses for the airport through the year 2001. The Airport Board submitted the plan to Irving. The city approved the plan on March 30, 1972. Each of the host cities permitted the airport to expand and construct according

to the Master Plan. Airline service began at the airport in January 1974.

In 1988, the Airport Board announced its $3.5 billion redevelopment plan. The improvements the Board proposed include the construction of two new runways, additional taxiways, aircraft holding areas, the extension of existing runways, and the construction of other airport facilities. The Federal Aviation Administration (FAA) assigned 100 million dollars to the initial phase of the extension plan. On April 7, 1992, the FAA issued a Record of Decision formally approving and authorizing funding for the construction of the new runway on the east side of the airport.

In 1989 and 1990, Irving, Euless, and Grapevine amended their comprehensive zoning ordinances. These amendments are to insure that all structures and land uses that might result in large environmental impacts, including but not limited to airports, are consistent with each city's comprehensive zoning plan. Each of these ordinances requires the Airport Board to submit a site plan, along with information about the environmental impacts of the plan, to get the required special or governmental use permits. The Airport Board promptly sued the host cities to avoid following the ordinances.

D/FW Airport is now the primary airport of the North Texas region. In passengers accommodated, it is also the second busiest airport in the nation.

### B. Procedural History

In the trial court, the Airport Board, American, Delta, UPS, Dallas, and Fort Worth filed a joint motion for summary judgment asserting:

1. The zoning ordinances are preempted by and are in violation of the Texas Municipal Airports Act insofar as they relate to the airport;

2. The zoning ordinances are preempted by and are in violation of federal law insofar as they relate to the airport;

3. Neither the Airport Board nor its constituent cities is impermissibly annexing any property in Irving, Euless, or Grapevine;

4. The Airport Board through its constituent cities is authorized to exercise eminent domain power to acquire roads and streets within Irving, Euless, and Grapevine; and

5. The Municipal Airports Act is constitutional.

Irving, Euless, and Grapevine also moved for summary judgment. The cities asserted home rule sovereignty and that the Airport Board is not a separate governing body. They also asserted that the Municipal Airports Act is unconstitutional.

The trial court granted appellants' motions for summary judgment only on ground three above. The trial court granted the host cities' motions except that it denied summary judgment on the annexation of property. The trial court did not reach the question of constitutionality. The Airport Board, American, Delta, UPS, Dallas, and Fort Worth bring seven points of error on appeal contending both federal and state law preempt the local ordinances and complaining the Airport Board has the right of eminent domain over the host cities.

### SUMMARY JUDGMENT

 In their first and second points of error, appellants state the trial court erred in granting appellees' motion for summary judgment and not granting appellants'. These points are sufficient to permit appellants to raise every available legal attack on the summary judgment the trial court rendered. *See Malooly Bros., Inc. v. Napier,* 461 S.W.2d 119, 121 (Tex.1970). "Where both parties file motions for summary judgment, and one is granted and one is denied, the denial may be considered by the reviewing court if the appealing party complains of both the granting of the opponent's motion and the denial of its own motion." *Utica Nat'l Ins. Co. v. Fidelity & Cas. Co.,* 812 S.W.2d 656, 658 (Tex. App.—Dallas 1991, writ denied). This Court will consider all evidence accompanying the motions in determining whether the trial court should have granted either side's motions. *Vest v. Gulf Ins. Co.,* 809 S.W.2d

531, 533 (Tex.App.—Dallas 1991, writ denied).

### A. Standard of Review

Because this is a summary judgment case, we apply the following standards:

1. The movant for summary judgment has the burden of showing there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

2. In deciding whether there is a disputed material fact issue precluding summary judgment, we must take evidence favorable to the nonmovant as true.

3. We indulge every reasonable inference in favor of the nonmovant and resolve any doubts in its favor.

*See Nixon v. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985).

 The summary judgment rule does not provide for a trial by deposition or affidavit. The rule provides a method for summarily ending a case that involves only a question of law and no genuine material fact issue. *See Gaines v. Hamman,* 163 Tex. 618, 358 S.W.2d 557, 563 (1962). The trial court's duty is to determine if there are any material fact issues to try, not to weigh the evidence or determine its credibility and try the case on affidavits. *Gulbenkian v. Penn,* 151 Tex. 412, 252 S.W.2d 929, 931 (1952). The purpose of the summary judgment rule is to eliminate patently unmeritorious claims or untenable defenses. The rule is not intended to deprive the litigants of their right to a full hearing on the merits of any real issue of material fact. *See Gulbenkian,* 151 Tex. at 416, 252 S.W.2d at 931.

 A movant must show its entitlement to summary judgment on the issues expressly presented to the trial court by conclusively proving all essential elements of its cause of action or defense as a matter of law. *See Swilley v. Hughes,* 488 S.W.2d 64, 67 (Tex.1972). The trial court may not grant summary judgment by default against the nonmovant for failing to respond to the motion when the movant's summary judgment proof is legally insufficient. *See City of Houston v. Clear Creek*

*Basin Auth.,* 589 S.W.2d 671, 678 (Tex. 1979).

To show its right to a summary judgment, a defendant must either disprove an essential element of the plaintiff's cause of action as a matter of law or establish all elements of its defense as a matter of law. *See Gibbs v. General Motors Corp.,* 450 S.W.2d 827, 828 (Tex.1970); *Pinckley v. Gallegos,* 740 S.W.2d 529, 531 (Tex.App.—San Antonio 1987, writ denied).

A nonmovant need not answer or respond to a motion for summary judgment to contend on appeal that the grounds expressly presented by the movant's motion are insufficient as a matter of law to support summary judgment. However, the nonmovant may not raise any other issues as grounds for reversal. *City of Houston,* 589 S.W.2d at 678.

Except to attack the legal sufficiency of the movant's grounds for summary judgment, the nonmovant must expressly present to the trial court any reason for avoiding the movant's entitlement to summary judgment. The nonmovant must present summary judgment proof when necessary to show a fact issue. The nonmovant must expressly present to the trial court in a written answer or response to the motion those issues that would defeat the movant's right to summary judgment. Failing to do so, the nonmovant may not assign them on appeal as error. TEX. R.CIV.P. 166a(c); *City of Houston,* 589 S.W.2d at 678–79.

There are no disputes in this case on the material facts. The issues involve the application and interpretation of relevant statutes. Under these circumstances, if we determine that the trial court erred in deciding the legal issues before it, this Court will render the judgment the trial court should have. *Janes v. Commerce Fed. Sav. & Loan Ass'n,* 639 S.W.2d 490, 491 (Tex.App.—Texarkana 1982, writ ref'd n.r.e.).

## FEDERAL PREEMPTION

### A. Applicable Law

Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. The Supremacy Clause empowers Congress to preempt state law. *Louisiana Pub. Serv. Comm'n v. F.C.C.,* 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). Federal preemption of state law can occur in three situations: (1) where Congress explicitly preempts state law; (2) where Congress impliedly preempts state law because it has occupied the entire field; and (3) where preemption is implied because there is an actual conflict between federal and state law. *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 300, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988).

Where preemption is claimed because a state law conflicts with Congressional action, federal law preempts the conflicting state law where compliance with both the federal and the state regulations is a physical impossibility, *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963), or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

Preemption is a matter of congressional intent. In determining whether federal law preempts a state cause of action, our "sole task is to ascertain the intent of Congress." *California Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987). However, we do not lightly presume preemption. *California Fed. Sav. & Loan Ass'n,* 479 U.S. at 281, 107 S.Ct. at 689. Overriding any preemption analysis is the presumption that the federal law does not displace existing state law. *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576 (1981). There is an initial presumption against preemption to insure that neither Congress unintentionally nor the courts unnecessarily will

disturb the federal-state balance. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Preemption must be the clear and manifest purpose of Congress. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). The critical question in any preemption analysis remains whether Congress intended federal regulation to supersede state law. *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 369, 106 S.Ct. at 1898.

### B. Application of the Law

Appellants assert the Federal Aviation Act of 1958 [3] and other federal legislation [4] create a pervasive scheme of regulation that encompasses all areas of aviation. They contend the Supremacy Clause preempts the local zoning ordinances of Irving, Euless, and Grapevine.

■ Over a thirty-year period, Congress has enacted a comprehensive scheme of legislation regulating aircraft and airport operations, aircraft noise, and the expansion of the nation's public airports for the specific purpose of establishing and maintaining a safe and efficient national air transportation system. However, this does not prove Congress's intent to preempt any local control over construction and expansion at major public airports. We find no express preemption in the legislation. Accordingly, we must look to Congressional intent.

Appellants contend that Congress's pervasive scheme shows a dominant federal interest in aviation and its intent to preempt local control over the construction of runways, taxiways, etc. Appellants contend *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973), holds Congress intends that federal law preempts all local regulation that touches upon airports and air travel. We do not read *City of Burbank* so broadly. *City of Burbank* is limited in its scope:

> [The Noise Control Act of 1972] reaffirms and reinforces the conclusion that FAA, now in conjunction with EPA, has full control over *aircraft noise*, preempting state and local control.
>
> \*　\*　\*　\*　\*　\*
>
> It is the pervasive nature of the scheme of federal regulation of *aircraft noise* that leads us to conclude that there is pre-emption.

411 U.S. at 633, 93 S.Ct. at 1859 (emphasis added). Nowhere in *City of Burbank* does the Court hold that all local regulation about aviation is preempted.

Appellants claim that *Burbank–Glendale–Pasadena Airport Authority v. City of Los Angeles*, 979 F.2d 1338 (9th Cir. 1992) (*"Burbank–Glendale"*), holds that *City of Burbank* preempts all local regulations. In *Burbank–Glendale*, the airport tried to construct new runways and taxiways on land already owned by the airport. The Ninth Circuit held that the Federal Aviation Act preempted any local regulation preventing such action and cited *City of Burbank* as authority. However, *Burbank–Glendale* is not on point.

In this case, the Airport Board wishes to expand onto land *not* now owned by the airport. The issues in this case involve more than noise and more than safety. Appellants want more land—land owned by

---

**3.** Pub.L. No. 85–726, 72 Stat. 731 (1958) (codified as 49 App.U.S.C. §§ 1301–1542).

**4.** Control and abatement of aircraft noise and sonic boom, 49 U.S.C. § 1431 (1978); Noise Control Act of 1972, Pub.L. No. 92–574, 86 Stat. 1234 (1972) (codified as 42 U.S.C. §§ 4901–4918); Airport Noise and Capacity Act of 1990, Pub.L. No. 101–508, tit. IX, subtit. D, §§ 9301–9309, 104 Stat. 1388–378 (1990) (codified as 49 App.U.S.C. §§ 2151–2158); National Aviation Noise Policy, 56 Fed.Reg. 48,628 (1991) (to be codified at 14 C.F.R. Part 91); Airport and Air-way Development Act of 1970, Pub.L. No. 91–258, tit. I, 84 Stat. 219 (1970) (codified as 49 U.S.C. §§ 1701–1742); Airport and Airway Trust Fund, 49 U.S.C. § 1714 (1980) (repealed); Airport and Airway Improvement Act of 1982, Pub.L. No. 97–248, tit. V, §§ 501–32, 96 Stat. 671 (1982) (codified as 49 App.U.S.C. §§ 2201–2227); Airport and Airway Safety and Capacity Expansion Act of 1987, Pub.L. No. 100–508, 101 Stat. 1486 (1987) (codified as 49 App.U.S.C. §§ 2201–2227; amends the 1982 Act); National Environmental Protection Act, 42 U.S.C. §§ 4321–4347 (1991).

individuals and the cities.[5] This was not the case in *Burbank–Glendale*. No one disputes that federal laws preempt local regulation within the boundaries of an airport.[6] We cannot find that the Ninth Circuit holds more.

As the trial court stated in its summary judgment order, there is "an important distinction between the regulation of an existing airport and the regulation of land use and the expansion of airports and airport facilities." Every case that allows preemption involved a nonproprietor municipality trying to control expansion or activity within the boundaries of an existing airport. For example, in *Village of Bensenville v. City of Chicago*, 16 Ill.App.3d 733, 306 N.E.2d 562 (1973), the Village tried to regulate the noise level of airport operations. In *United States v. City of New Haven*, 447 F.2d 972 (2d Cir.1971), the City tried to prevent the airport from setting up a "clear zone" needed for safety reasons beyond an already-existing runway. *See also United States v. City of Berkeley*, 735 F.Supp. 937 (E.D.Mo.1990) (city tried to stop the airport from building radar facility *within* the airport); *County of Cook v. Priester*, 22 Ill. App.3d 964, 318 N.E.2d 327 (1974), *aff'd*, 62 Ill.2d 357, 342 N.E.2d 41 (1976) (local ordinance tried to condition expansion on restriction of *weight* of aircraft). In each of these cases, federal legislation clearly preempts the local law. This is not the case here.

Further, the extended runway in *Burbank–Glendale* was needed for safety reasons. Without the extension, aircraft would have to cross an active runway at its midpoint thereby increasing the risk of runway collisions. *See Burbank–Glendale*, 979 F.2d at 1339. There is no dispute that local law is preempted where safety is the main issue. In this case, appellants have not shown that safety is the main concern.[7]

When considering the issue of local control of *land* that is not already part of an airport, courts have not found preemption. In *City of Burbank*, Justice Rehnquist's dissent pointed out what the majority opinion did not preempt:

> A local governing body could ... use its traditional police power to prevent the establishment of a new airport or the expansion of an existing one within its territorial jurisdiction by declining to grant the necessary zoning for such a facility. Even though the local government's decision in each case were motivated entirely because of the noise associated with airports, I do not read the Court's opinion as indicating that such action would be prohibited by the Supremacy Clause merely because the Federal Government has undertaken the responsibility for some aspects of aircraft noise control.

411 U.S. at 653, 93 S.Ct. at 1869. No Justice for the majority opinion disputed Justice Rehnquist's explanation. Various courts have reached similar conclusions. *See Faux–Burhans v. County Comm'rs*, 674 F.Supp. 1172, 1174 (D.Md.1987), *aff'd*, 859 F.2d 149 (4th Cir.1988), *cert. denied*, 488 U.S. 1042, 109 S.Ct. 869, 102 L.Ed.2d 992 (1989) ("The plaintiff can point to no case law extending the preemption holding of *City of Burbank* to the lengths he now

---

**5.** In order to complete the planned expansion, the record shows the Airport Board will need to acquire 772 dwelling units (either single-family units or apartments: 764 on East side, 8 on West side), Greenview Baptist Church, Airport Assembly of God Church, Laotian Buddhist Temple, Grapevine Middle School, the Knights of Columbus Hall (Irving), one 7–unit mobile home park, and four small businesses. The Board will also need to acquire various streets and alleyways currently controlled by the host cities.

**6.** Appellants do contend that the zoning ordinances attempt to control the airport itself. Appellees, however, concede in their brief that the ordinances do not purport to give the host cities the authority to operate the airport or engage in planning for the airport. Appellees further concede the ordinances do not purport to stop, prohibit, or alter the proposed expansion of the airport. Appellees assert only that the ordinances would subject the Airport Board property and certain projects thereon to the same zoning laws which apply to all other landowners within the host cities.

**7.** As it appears from the record, the main reason for expansion in this case is to increase air-traffic capacity. Nowhere is it shown that the expansion is mandatory for safety reasons.

would seek to stretch it...." Case involved land-use zoning of private airport.); *Bethman v. City of Ukiah*, 216 Cal.App.3d 1395, 1406, 265 Cal.Rptr. 539, 546 (1989) (no federal preemption of state or municipal regulation of the location and environmental impact of airports.); *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 219 (8th Cir.1990) ("We see no conflict between a city's regulatory power over land use, and the federal regulation of airspace, and have found no case recognizing a conflict."); *Wright v. County of Winnebago*, 73 Ill. App.3d 337, 344, 29 Ill.Dec. 347, 352, 391 N.E.2d 772, 777 (1979) (FAA does not preempt local zoning authority.).

 Furthermore, the FAA plainly states the local ordinances involved here are not preempted. In its Record of Decision approving the expansion project, the FAA stated:

> Whether the Airport is required to obtain a local permit is a matter of local law and is not relevant to the approval of the federal project involving the construction of the two new runways. The FAA assumes that if the ordinances are finally determined to be applicable to the D/FW Airport Board, the Board will comply with them, or as provided by the ordinances, will be exempted from compliance.

We give great deference to the views of a federal agency with regard to the scope of its authority. *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).[8]

In *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 197 (D.C.Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991), the court quoted the FAA's Environmental Impact Statement on a proposed airport expansion:

> The scope of alternatives considered by the sponsoring Federal agency, where the Federal government acts as a proprietor, is wide ranging and comprehensive. Where the Federal government acts, not as a proprietor, but to approve and support a project being sponsored by a local government or private applicant, the Federal agency is necessarily more limited. In the latter instance, the Federal government's consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the siting and design of the project.

\* \* \* \* \* \*

In the present system of federalism, the FAA does not determine where to build and develop civilian airports, as an owner/operator. Rather, the FAA facilitates airport development by providing Federal financial assistance, and reviews and approves or disapproves revisions to Airport Layout Plans at Federally funded airports....

We find the FAA regulations preempt local laws, but only in the specific areas set out by Congress. These areas include safety, airspace, and noise control. Congress does not expressly or impliedly preempt local land-use regulation. We overrule appellants' point of error five.

## STATE PREEMPTION

### A. Applicable Law

 Irving, Euless, and Grapevine are home rule cities under article XI, section 5 of the Texas Constitution. "Home-rule cities possess the full power of self-government and look to acts of the legislature not for grants of power, but only for limitations on their powers." *MJR's Fare of Dallas, Inc. v. City of Dallas*, 792 S.W.2d 569, 573 (Tex.App.—Dallas 1990, writ denied). The powers of home rule cities are subject to and may be limited by their charters, the constitution, or general law. *Lower Colo. River Auth. v. City of San Marcos*, 523 S.W.2d 641, 644 (Tex.1975).

---

**8.** Appellants try to argue about a letter generated by the FAA after the summary judgment hearing. This letter is attached as an appendix to appellants' Reply Brief. The attachment of documents as appendices to briefs is not formal inclusion in the record on appeal and, thus, the documents cannot be considered. *Perry v. Kroger Stores, Store No. 119*, 741 S.W.2d 533, 534 (Tex.App.—Dallas 1987, no writ).

A limitation on the power of home rule cities by general law or by charter may be either an express limitation or one arising by implication. "Such a limitation will not be implied, however, unless the provisions of the general law or of the charter are clear and compelling to that end." The intention of the Legislature to impose such limitations must "appear with unmistakable clarity."

*Lower Colo. River Auth.*, 523 S.W.2d at 645 (citations omitted); *see also Cook v. City of Addison*, 656 S.W.2d 650, 654 (Tex. App.—Dallas 1983, writ ref'd n.r.e.).

D/FW Airport operates under the Texas Municipal Airports Act. TEX.REV.CIV.STAT. ANN. art. 46d (Vernon Supp.1993). Article 46d–7(b) sets out the scope of the Act:

> A municipality, which has established or acquired or which may hereafter establish or acquire an airport or air navigation facility, is authorized to adopt, amend and repeal such reasonable ordinances, resolutions, rules, regulations and orders as it shall deem necessary for the management, government and use of such airport or air navigation facility under its control or an airport hazard area relating to the airport, whether situated within or without the territorial limits of the municipality. For the enforcement thereof, the municipality, may, by ordinance or resolution, as may by law be appropriate, appoint airport guards or police, with full police powers, and fix penalties, within the limits prescribed by law, for the violation of the aforesaid ordinances, resolution, rules, regulations and orders. Said penalties shall be enforced in the same manner in which penalties prescribed by other ordinances, or resolutions of the municipality are enforced. To the extent that an airport, air navigation facility, or airport hazard area controlled and operated by a municipality is located outside the territorial limits of the municipality, it shall, subject to Federal and State laws, rules and regulations, be under the jurisdiction and control of the municipality controlling or operating it, and no other municipality shall have any authority to charge or exact a license fee or occupation tax for operations thereon. Nothing in the Act shall authorize any municipality to adopt or amend any ordinances, resolutions, rules, regulations, or orders establishing zones or otherwise regulating the height of structures or natural growths in any area, or in any manner, other than as provided in the Airport Zoning Act (Article 46e–1 et seq., Vernon's Texas Civil Statutes).[9]

Article 46d–2 states the general powers of municipalities in setting up, operating, and maintaining an airport:

> Every municipality is authorized, out of any appropriations or other moneys made available for such purposes, to plan, establish, develop, construct, enlarge, improve, maintain, equip, operate, regulate, protect and police airports and air navigation facilities, either within or without the territorial limits of such municipality and within or without the territorial boundaries of this State....

No express provisions in the Act limit the authority of a home rule city. We must determine whether the legislature intended any limitations "with unmistakable clarity" in "clear and compelling" language.[10]

### B. Application of the Law

■ Appellants contend the legislature drafted the Act in the broadest possible terms thereby preempting any nonproprietor municipality's land-use ordinances. They further contend the Act grants the Airport Board full police power, including zoning, over all property in and around the airport. We do not agree.

Appellants cite *City of Lucas v. North Texas Municipal Water District*, 724 S.W.2d 811 (Tex.App.—Dallas 1986, writ

---

9. The Airport Zoning Act has been repealed. Act of June 16, 1947, 51st Leg., ch. 391, 1947 Tex.Gen.Laws 784, *repealed by* Act of May 21, 1987, 70th Leg., ch. 149, § 49(1), 1987 Tex.Gen. Laws 1306.

10. As stated before, the issue in this case concerns property onto which the airport desires to expand and not property now designated as the airport's. Appellees concede there is no dispute over control of the airport itself.

ref'd n.r.e.), and *Austin Independent School District v. City of Sunset Valley,* 502 S.W.2d 670 (Tex.1973), to support their claim of implied preemption of local law.[11]

In *City of Lucas,* the North Texas Municipal Water District wished to build a facility within the extraterritorial jurisdiction of Lucas. The Water District is a special purpose municipality set up under the "District Act."[12] Section 27(a) of the District Act provides that the Water District may, in its "sole discretion," choose to locate or operate its facilities "at any location whatsoever." Section 27(1) of the District Act provides in part "to the extent of any conflict or inconsistency between any provisions of this section and any other ... law, this section shall prevail and control...." The plain language of the District Act provides for preemption of local zoning ordinances that try to prevent the Water District from building a facility within a municipality. *See City of Lucas,* 724 S.W.2d at 816. There is no comparable language in the Municipal Airports Act.

In *Sunset Valley,* Sunset Valley tried to create a purely residential community and zone out any schools. The court held that the city could not do this because section 1, article VII of the Texas Constitution directs the legislature to "establish ... an efficient system of public free schools." The legislature has delegated this duty, in part, to the independent school districts and has given them a right of eminent domain. TEX.EDUC.CODE ANN. § 23.31 (Vernon 1972); *Sunset Valley,* 502 S.W.2d at 672. We do not find a comparable mandate in this case. *Sunset Valley* is further distinguishable. No provision of the Texas Education Code authorizes a school district to locate any facilities outside its jurisdiction like the Municipal Airports Act. Sunset Valley is located within the jurisdiction of the Austin Independent School District. This case involves locating facilities outside a city's own jurisdiction.

No Texas court has considered the particular issue before us. Texas courts, however, have examined statutes that give a city exclusive jurisdiction to operate and regulate a public facility outside its territorial boundaries. These courts have held that, absent unmistakably clear language from the legislature, such statutes do not alter the right of host home rule cities to apply their own zoning ordinances to the facility.

In *City of New Braunfels v. City of San Antonio,* 212 S.W.2d 817 (Tex.Civ.App.—Austin 1948, writ ref'd n.r.e.), New Braunfels sought to prohibit San Antonio from getting title to a power plant located within New Braunfels. San Antonio was proceeding under article 1108 of the Texas Revised Civil Statutes governing public utilities.[13] Article 1108 provided that any town or city may own, construct, operate, regulate, and control a public utility either within or without the limits of such town or city. Article 1116 of the Texas Revised Civil Statutes also provided that the proprietor town may impose penalties for the violation of any rules and regulations, interference, trespassing, or injury to the facility.[14] Despite this broad language, the court held that these statutes "must, in order to be constitutional, be construed as bestowing no power upon one home rule city to enact ordinances effective within the limits of another home rule city." *City of New Braunfels,* 212 S.W.2d at 825.

In *City of Bells v. Greater Texoma Utility Authority,* 790 S.W.2d 6 (Tex.App.—Dallas 1990, writ denied), the Texoma Utility Authority (the Utility) purchased land that it intended to use as a landfill. Bells later annexed the property and passed an ordinance restricting the size and location of waste disposal sites within the city limits

---

11. Appellants also cite numerous cases from other jurisdictions to support their argument, but none are exactly on point. We limit our discussion to analogous Texas law.

12. Act of April 20, 1951, 52nd Leg., ch. 62, 1951 Tex.Gen.Laws 96, *amended by* Act of April 30, 1975, 64th Leg., ch. 90, §§ 1, 27, 1975 Tex.Gen. Laws 238.

13. Act of March 20, 1909, 31st Leg., ch. 88, 1909 Tex.Gen.Laws 159, *repealed by* Act of May 21, 1987, 70th Leg., ch. 149, § 49(1), 1987 Tex.Gen. Laws 1306 (current version at TEX.LOC.GOV'T CODE ANN. § 402.001 (Vernon 1988)).

14. TEX.REV.CIV.STAT.ANN. art. 1116 (Vernon 1963).

and extraterritorial jurisdiction of the city. The Utility argued the legislature authorized it to operate and construct this facility. *See* Act of May 2, 1979, 66th Leg., ch. 97, 1979 Tex.Gen.Laws 177, *amended by* Act of June 17, 1983, 68th Leg., ch. 398, 1983 Tex.Gen.Laws 2160 (the District Act). Section 3 of the District Act provides:

(a) [T]o the extent that the provisions of any of those general laws may be in conflict or inconsistent with the provisions of this Act, the provisions of this Act prevail.

(b) The district has the following rights, powers, privileges, and functions:

(1) the authority to operate, control, purchase, construct, lease, or acquire property, works, facilities, and improvements, whether previously existing or to be made, constructed, or acquired, within or without the boundaries of the district that its governing body finds necessary or required to carry out the authority granted by this Act and the general laws....

The Utility stated this language gave it the authority to use the land it had purchased as a waste disposal site. It also argued Bells could not use its land-use controls to "frustrate a special purpose political subdivision from carrying out its legislative mandate." *City of Bells*, 790 S.W.2d at 17. This court did not read the section so broadly. We held:

It should be readily apparent that authority to locate an activity outside of one's jurisdiction is not unlimited authority to locate the activity inside someone else's jurisdiction.

*City of Bells*, 790 S.W.2d at 18.

■ Appellants further contend the Municipal Airports Act grants the Airport Board full "police power" over any nonproprietor municipality. They assert that the "police power" mentioned in the Act includes the power to zone. Appellants misinterpret the Act. Article 46d–7(b) mentions police power only in reference to employing guards and police officers "with full police powers." Article 46d–2(a) is similarly limited: "Every municipality is authorized to ... protect and police air-

ports and air navigation facilities...." Appellants also cite to article 46d–14(d)(5), which provides that a joint airport board may agree on police regulations as authorized in 46d–7. Article 46d–14(d)(5) further provides that the regulations will have the same force and effect at the airport involved as the ordinances would have in the board members' respective jurisdictions. We conclude this section does not grant the Airport Board any power to zone.

Finally, in 1966, the Texas Constitution was amended to provide a procedure for the creation of regional airport authorities. Following the amendment, the legislature enacted the North Central Texas Airport Authority Act of 1967. This act provided that the Airport Authority would have the power to exercise eminent domain and adopt and enforce its own zoning regulations. As required by article 9, section 12 of the Texas Constitution and the Airport Authority Act, Tarrant and Dallas Counties held a referendum to decide whether to create the North Central Texas Airport Authority. Dallas County voters rejected the plan. When enacting the Airport Authority Act, the legislature granted much broader and specific powers than are found in the Municipal Airports Act. If the Texas Legislature intended for a *municipal* airport to have the same authority and powers that it granted to regional airports under the Airport Authority Act, it could have provided for them in the statute. We overrule appellants' points of error three and four.

## EMINENT DOMAIN

### A. Applicable Law

■ "The Legislature acting for the state has primary and plenary power to control and regulate public roads and streets. It may delegate that power to counties or municipal corporations, but such a grant of authority may be revoked or modified at any time." *State v. City of Austin*, 160 Tex. 348, 331 S.W.2d 737, 741 (1960); *see also State v. City of Denton*, 542 S.W.2d 224, 226 (Tex.Civ.App.—Fort Worth 1976, writ ref'd n.r.e.). The legislature has delegated to home rule cities "ex-

clusive dominion, control, and jurisdiction in, over and under the public streets, avenues, alleys, highways and boulevards" within those cities. TEX.REV.CIV.STAT.ANN. art. 1175(16) (Vernon 1963). Any limitation on the powers of a home rule city must appear with "unmistakable clarity" and in "clear and compelling" language. *Lower Colo. River Auth.*, 523 S.W.2d at 645. We do not find such limitation on the powers of a home rule city in the Municipal Airports Act.

Eminent domain appears in only two sections of the Act:

Art. 46d–2(a) Establishment, Operation, Land Acquisition. Every municipality is authorized . . . to plan, establish, develop, construct, enlarge, improve, maintain, equip, operate, regulate, protect and police airports and air navigation facilities, either within or without the territorial boundaries of this State, including:

(1) the construction, installation, equipment, maintenance and operation at such airports of any buildings and other facilities including but not limited to buildings or facilities for:

(A) the landing and taking off of aircraft;

\* \* \* \* \* \*

and

(2) the purchase and sale of supplies, goods and commodities as incident to the operation of its airport properties. For such purposes the municipality may use any available property that it may now or hereafter own or control and may, by purchase, gift, devise, lease, *eminent domain proceedings* or otherwise, acquire property, real or personal, or any interest therein including easements in airport hazards or land outside the boundaries of any airport or airport site, as are necessary to permit safe and efficient operation of the airport. . . .

Art. 46d–14 Joint Operations.

(a) [A]ny agency of the State government when acting jointly with any municipality, may exercise and enjoy all of the powers, privileges and authority conferred by this Act upon a municipality.

(d) Limitation on Joint Board.

(3) Eminent Domain. Eminent domain proceedings under this Section may be instituted only by authority of the governing bodies of the constituent public agencies of the joint board. If so authorized, such proceedings shall be instituted in the names of the constituent public agencies jointly, and the property so acquired shall be held by said public agencies as tenants in common until conveyed by them to the joint board.

(emphasis added). As can be seen from the Act, the provisions authorizing eminent domain are ambiguous.

Article 46d–14(d)(3) clearly relates back to the powers provided for in article 46d–2(a)(2). This is where the ambiguity arises. Article 46d–2 provides for the use of eminent domain. However, its use is limited. Eminent domain is authorized only in the section about "the purchase and sale of supplies, goods and commodities as incident to the operation of its airport properties." Eminent domain is not mentioned in section 46d–2(a)(1)(A), which covers the construction, installation, equipment, maintenance, and operation of facilities for the landing and taking off of airplanes. In our view, this language does not meet the tests of unmistakable clarity and clear and compelling language.

An example of preemption of a home rule city's power of eminent domain is found in the Turnpike Projects Act. *See* TEX.REV.CIV.STAT.ANN. art. 6674v (Vernon Supp.1993). Section 5(h) of the Projects Act gives the Texas Turnpike Authority the power to acquire public lands by condemnation. Section 8 of the Projects Act further grants the Turnpike Authority all the power available to the State Highway Commission. Article 6674w–3 of the Texas Revised Civil Statutes grants the power of eminent domain to the Highway Commission.[15] Article 6674w–5 authorizes the Highway Commission to exercise any power within the limits of any county, incorporated city, town or village, including *home*

---

**15.** TEX.REV.CIV.STAT.ANN. art. 6674w–3 (Vernon Supp.1993).

*rule cities.* "[S]uch act or exercise of power shall qualify and render inexclusive the dominion of such ... Home Rule Cities, with respect to the specific streets, alleys, and other public ways affected by such act or exercises of power." TEX.REV.CIV.STAT. ANN. art. 6674w–5 (Vernon 1977).

A home rule city's power of eminent domain is preempted with unmistakable clarity in clear and compelling language. *See Texas Turnpike Auth. v. Shepperd,* 154 Tex. 357, 279 S.W.2d 302, 305–06 (1955); *City of Denton,* 542 S.W.2d at 227 ("By express language contained in this Act ... the right of Home Rule Cities to control the streets was modified and that authority was delegated to the Turnpike Authority....."). We find nothing similar in the Municipal Airports Act.

Appellants further rely on section 251.-001 of the Local Government Code to give them the power of eminent domain over the host cities. Section 251.001 provides:

(a) When the governing body of a municipality considers it necessary, the municipality may exercise the right of eminent domain for a public purpose to acquire public or private property, whether located inside or outside the municipality, for any of the following reasons:

(1) the providing, enlarging, or improving of a[n] ... airport,....

Again, we do not find preemption of the host home rule cities' powers.

■ A home rule city, to which the state has specifically entrusted police powers, has the power to inquire into the reasonableness of the manner by which eminent domain is exercised within its corporate limits. *Porter v. Southwestern Pub. Serv. Co.,* 489 S.W.2d 361, 365 (Tex.Civ. App.—Amarillo 1972, writ ref'd n.r.e.) (electric company wished to use its power of eminent domain to avoid local zoning ordinances). The eminent domain power granted by the Municipal Airports Act is not usurped by merely "requiring it to meet certain standards any more than it usurps the control and management of individuals over their property and affairs by making them meet the same standards." *Porter,* 489 S.W.2d at 365. To allow otherwise

would be to give all power to the Airport Board to determine each host city's peculiar problems of health, safety, and welfare. *See Porter,* 489 S.W.2d at 365.

■ To further support their claim that they have the right to condemn the cities' public streets and roads, appellants argue we should apply the "paramount importance" test. We disagree.

The paramount importance test provides: [T]he law does not authorize the condemnation of property which has already been dedicated to a public use, when the condemnation will practically destroy the use to which the property has been devoted. We do not ordinarily imply such power from a general power conferred by statute. We will imply the power, however, where the necessity is so great as to make the new enterprise of paramount importance to the public and it cannot be practically accomplished in any other way.

*Sabine & E.T. Ry. Co. v. Gulf & I. Ry. Co.,* 92 Tex. 162, 46 S.W. 784, 786 (1898); *Austin Indep. Sch. Dist. v. Sierra Club,* 495 S.W.2d 878, 882 (Tex.1973). This power may be exercised where the public property to be condemned is outside the jurisdiction of the condemning entity. *See El Paso County v. City of El Paso,* 357 S.W.2d 783, 785 (Tex.Civ.App.—El Paso 1962, no writ); *Fry v. Jackson,* 264 S.W. 612, 618 (Tex.Civ. App.—Fort Worth 1924, no writ).

Appellants misinterpret the application of this test. We apply the paramount importance test only when the condemning entity has the power of eminent domain and where there is public property to be condemned for a new public use. As we have held, the Airport Board does not have the power of eminent domain over a home rule city. Further, appellants have made neither a showing that the property they wish to condemn is public nor that the new use for the property is public. As the record shows, the new use the Airport Board proposes is not to benefit the public but to benefit the airport, American, Delta, and UPS by increasing air-traffic capacity. The cases cited by appellants hold only the condemning entities had the power to con-

demn property in other jurisdictions, not that they had the right to do so. In each case, the jurisdiction where the public property was located had agreed to the change in public use. *See Fry*, 264 S.W. at 618 (city, commissioner's court, and highway commission agreed to the project); *El Paso County*, 357 S.W.2d at 786 (city and county agreed to the transfer of property for different public use); *Austin Indep. Sch. Dist.*, 495 S.W.2d at 879–80 (city and school district agreed to transfer). We overrule appellants' fifth and sixth points of error.

We conclude the trial court did not err in overruling appellants' joint motions for summary judgment and in granting the host cities' motions for summary judgment. We overrule appellants' points of error one and two. We affirm the trial court's judgment.